# CHARLESTOWN.

DICKESCHIED *v.* EXCHANGE BANK *et al.*

Submitted June 5, 1886.—Decided September 18, 1886.

1. To constitute a valid gift *inter vivos*, the donor must be divested of, and the donee invested with, the right of property in the subject of the gift; it must be absolute, irrevocable and without any reference to its taking effect at some future period. The donor must deliver the property and part with all present and future dominion over it. (p. 359.)

2. To constitute a valid gift *causa mortis*, it is essential, that the donor should make it in contemplation of death, either in his last illness, or while he is in other imminent peril, and that his death should result from such illness or peril. The donor must part with all dominion over it, so that no further act of him or of his personal representative is necessary to vest the title perfectly in the donee, to belong to him presently as his own property, in case the donor should die of his present illness or from the impending peril, without making any change in relation to the gift, leaving the donee surviving him. (p. 360.)

3. Delivery at the time of making the gift is essential to a perfect gift *causa mortis*. It is not the possession of the donee, but the *delivery* to him by the donor, that is material. An after-acquired possession, or a previous and continuing possession of the donee, though by the authority of the donor, is insufficient. (p. 362.)

4. Where a party claims title to personal property as a gift, either *inter vivos* or *causa mortis*, the burden of proof, in whatever form the issue may be presented, rests upon him to establish the validity of the gift, of which the delivery of possession is the strongest and most material. (p. 360.)

5. The mere possession of the subject of the alleged gift, unaccompanied by proof of its delivery by the donor to the donee, is insufficient to establish it as a gift either *inter vivos* or *causa mortis.* (p. 360.)

6. Every person claiming property as a gift thereby admits, that up to the time when the gift is alleged to have been made, it belonged to the donor; and as the law does not presume that the owner parted with his property without any valuable consideration, the gift itself and the delivery thereof to the donee must be proved by the party claiming under it. (p. 361.)

7. If the agent of the donee, residing with the donor, be authorized to accept and receive the gift, so that actual delivery thereof to him is a delivery to such donee, ⌐and the gift is in fact so delivered to and accepted by him at the place of the donor's residence, his possession thereof at such place of residence will be insufficient to make it a valid gift.  ₍p. 370.)

8. If the subject of a gift be delivered by the donor to a third person with authority to deliver it to the donee, such third person, until the authority is executed by an actual delivery to, and acceptance by the donee, is the agent of the donor, who, until such actual delivery is made, may revoke the authority and take back the gift. (p. 370.)

9. If such actual delivery to the donee do not take place during the lifetime of the donor, the authority of such third person to deliver the gift is revoked by the donor's death ; the property does not pass to the donee but remains in the donor, and goes to his executor or administrator. (p. 371.)

10. The words "goods" and "chattels" as used in sec. 1. of ch. 71 of the Code of 1868 include money and every other kind of personal property which may be the subject of a gift *inter vivos* or *causa mortis.* (p. 368.)

11. An instruction to the jury which tells them "If they believe all the evidence offered on behalf of the defendant and all the evidence offered for the plaintiff, so far as the same does not conflict with the evidence on behalf of the defendant, they should find for the plaintiff," is erroneous, because it is ¦in effect an instruction as to the weight of the evidence. (p. 350.)

12· "O. D." deposited in bank fourteen bags of silver coin of the value of $7,496.75, which was claimed by "H. R." administra-

tor, &c., as the property of his decedent.   Upon the refusal of
the bank to deliver the coin to "O. D." she brought an
action of *detinue*, to recover the same.   The bank appeared to
the action, filed the affidavit prescribed by sec. 1 of ch. 107 of the
Code of 1868, and on its motion said administrator was required
to inter-plead with the plaintiff:   HELD,

That under said sec. 1 of ch. 107, the inter-pleader was properly
   directed.   (p. 349.)

13. The form of the issue provided for by said section and the posi-
   tion of the parties in relation thereto must be determined by
   the court from the facts disclosed by their respective pleadings;
   therefore the judgment of the circuit court will not be reversed,
   the facts appearing on the trial, and not disclosed by the plead-
   ings, show, that the form of the issue ought to have been differ-
   ent, and the position of the parties in relation thereto ought to
   have been reversed.   (p. 349.)

*D. Lamb* and *Caldwell & Caldwell* for plaintiff in error.

*M. T. Frame* and *W. P. Hubbard* for defendant in error.

Woods, JUDGE:

This was an action of *detinue* brought in the circuit court
of Ohio county by Othilie Dickeschied against the Exchange
Bank of Wheeling for the recovery of a trunk, fourteen
sacks, and $7,843.00 in silver coin contained therein.   The
declaration contained three counts in the usual form, sub-
stantially alleging that on March 27, 1883, the plaintiff de-
livered to the defendant, one tin covered trunk, of the value
of $10.00;  fourteen sacks of the value of fifty cents each,
and silver coin contained therein of the value of $7,843.00, to
be re-delivered to the plaintiff on request; that on March 30,
the defendant being requested so to do, refused to deliver,
and still detained the same to the plaintiff's damage of
$8,000.00.   Guenther Schuchardt was assassinated on March
19, 1883, about six o'clock P. M.   On the twenty-eighth of
the same month Henry M. Russell was appointed and quali-
fied as the curator of his estate; and on the same day he gave
notice in writing to the defendant's cashier, that he claimed
said money as the property of his decedent.   On April 28,
1883, the will of Guenther Schuchardt was admitted to pro-
bate, and said Russell was appointed and qualified as the
administrator of said Schuchardt, with his will an-

nexed, and he again notified the bank that he claimed the money as part of the estate of his decedent.

On May 12, 1883, the defendant filed in said cause the affidavit of its cashier stating that—"the Exchange Bank of Wheeling has been duly served with process in said action of *detinue*, that the same has been brought by the plaintiff for the recovery of the possession of a certain trunk, containing fourteen linen bags of silver money of the value of $7,496.75, now in the keeping and possession of the bank; that the bank makes no claim to said property; that the same was left with said bank for safe keeping by one Wendel Dickescheid on March —, 1883, who subsequently stated it to be the property of the plaintiff; that said property is claimed by Henry M. Russell as curator of the estate of Guenther Schuchardt, deceased, and that said bank does not collude with said curator but is ready to deliver the said property to the owner thereof as the court may direct."

On May 3, 1883 the bank filed in the cause a similar affidavit of its cashier alleging the same facts, except that the value of the money in the sacks was $7,496.75 and *no more,* and not of the value of $7,843.00, as in the plaintiffs declaration is alleged and that the money was claimed by Henry Russell in his character of administrator of the estate of decedent. On May 14, 1883, on motion of the defendant, and against the objection of the plaintiff, Henry M. Russell in his character of such administrator of Guenther Schuchardt was made a defendant in the action and required to appear and state the nature of his claim and to maintain or relinquish the same, and thereupon the court stayed the proceedings in the action; to this also the plaintiff excepted. Russell as such administrator appeared, waived service of process and stated that of the property in the declaration mentioned, the silver money to the amount and of the value of $7,496.75 is not, nor is any part thereof the property of the plaintiff nor is she entitled to the possession of the same, or any part thereof; and further, that the said money to the amount and of the value aforesaid was the money and property of the said Guenther Schuchardt at the time of his death, and now is the money and property of said Henry M. Russell administrator .with the will annexed of Guenther Schuchardt, deceased, and as such administrator,

he is entitled to the possession thereof, and thereupon moved
the court to cause an issue therein to be tried whether said
silver money to the amount and of the value aforesaid was at
the time of the bringing of this suit, or any, and if any what
part thereof was the money and property of Othilie Dicke-
schied, on the trial of which issue she shall be plaintiff, and
said administrator shall be defendant, which motion the
court overruled, and the administrator excepted.   There-
upon an issue was directed to ascertain whether said silver
money was the money and property of Henry M. Russell as
such administrator, in which issue he was made plaintiff and
Othilie Dickeschied defendant, and to this action of the court
the administrator again excepted.·

At the December term, 1885, the issue was tried and a ver-
dict rendered in favor of Othilie Dickeschied.   The admin-
istrator moved to set the verdict aside and award him a new
trial, which motion was overruled and he again excepted,
and filed his bill of exceptions, whereby all the evidence
which was before the jury, was certified.   Upon this verdict
the court rendered judgment in favor of Othilie Dickeschied,
and ordered that said silver coin be paid to her with costs.

To this judgment the administrator of Schuchardt has
obtained a writ of error, and has assigned the following errors
to his prejudice :

First. In overruling his motion that on the trial of the issue,
the said Othilie Dickeschied should be made plaintiff therein
and said administrator defendant, and in directing that
Othilie Dickeschied should be defendant in the issue, and
said administrator plaintiff therein.

Second.—In refusing to give to the jury the first, second,
third, fifth and sixth instructions, asked for by him.

Third.—In refusing to give the fourth instruction asked
for by him in the form in which it was asked, and in modi-
fying, and giving the same to the jury as so modified; and
in refusing to set aside the verdict and grant the plaintiff on
the said issue a new trial.

The proceedings in this case have been commenced and
carried on under the provisions of sec. 1, ch. 107 of the Code
of 1868.   Though not strictly an interpleader, which might
have been maintained in a court of equity, the section is

taken from the act of parliament, 1 and 2 William IV. ch. 58, and was intended to confer upon courts of law many of the powers exercised by courts of equity, by extending this remedy to many cases to which it was not formerly applicable.

The bill of interpleader in equity can only be maintained, where two or more persons claim the same thing by different or separate interests, and another person not knowing to which of the claimants he ought of right to render a debt or duty, or deliver property in his custody, fears he may be injured by some of them; as where the plaintiff says, "I have a fund in my possession, in which I claim no personal interest, and to which you, the defendants, set up conflicting claims; pay me my costs, and I will bring the fund into court, and you shall contest it between yourselves."

In such a bill the plaintiff must state his own rights and the several claims of the defendants, and pray that they may interplead so that the court may adjudge to whom the thing in controversy belongs. He must negative any interest in himself in the matter in controversy, and show that he is a mere stakeholder, and that he is ignorant of the rights of the respective parties who are called upon by him to interplead; or at least he must show that there is some doubt to which of such parties the debt or duty belongs, so that he can not safely pay or render it to one, without risk of being made liable for the same debt or duty to the other.

The plaintiff in such a bill is also required to show a clear title in himself to sustain the bill, for it will be dismissed, however proper in other respects the case might be for an interpleader, if the bill should show that the title of the plaintiff is that of an agent for one of the parties only, as if he had received money by the authority of his principal, and for his use, he would be bound to pay over the money to his principal, notwithstanding any intervening claims of a third person, for a mere agent to receive, for the use of another, cannot be converted into an implied trustee by reason of an adverse claim, since his possession is the possession of his principal. 2 Story Eq. Juris. § 817, Story Eq. Pldgs. § 296; 2 Dan. Ch'y Pldgs. & Pr. 1666.

The prayer of the bill of interpleader should also be correctly framed, by praying that the defendants may set forth

their titles, and may interplead and settle and adjust their demands between themselves. Such bill generally prays an injunction to restrain the proceedings of the claimants, or either of them at law ; and whenever this is done, the plaintiff should offer to bring the money into court, and it must be brought into court before the court will ordinarily act on this part of the prayer. To such bills an affidavit is always required of the plaintiff that he does not collude with either of the defendants. Story's Eq. Pl'gs § § 291–298 ; 2 Dan. Ch'y Pl'd'gs & Pr. 1666. Such a bill must also show that the plaintiff has a right to compel the defendants to interplead whatever rights they may claim.

The claims of the defendants should be specifically set forth, so that they may appear to be of the same nature and character, and the fit subject of a bill of interpleader, for such bills do not ordinarily lie, except in cases of privity of some sort, between all the parties; such as privity of estate, or title, or contract and where the claim by all is of the same nature and character. Where the claimants assert their rights under adverse title, and not in privity, and where their claims are of different natures a bill of interpleader cannot be maintained.

It is apparent that upon the facts disclosed by the affidavits of the defendant's cashier, such a bill in this case, could not have been maintained ; for they not only fail to set forth specifically the claims of the plaintiff and the defendant ; that they are of the same nature and character, and that they are in privity with each other, but they clearly show that they claim the money in controversy under adverse titles, and that the bank obtained possession of the money as the agent of the plaintiff, and that its possession is her possession. When, in a bill of interpleader properly brought, the court has decreed that the defendants shall interplead, the plaintiff is generally permitted to withdraw from the suit, and the defendants are severally required to set forth all their respective titles to the subject in controversy, and having done so, each of them is required to establish his pretensions by competent and sufficient proof. Such a bill is considered as putting the defendants to contest their respective claims, just as a bill does, which is brought by an executor or trustee, to ob-

tain the direction of the court, upon the adverse claims of different defendants. If at the hearing, the question between the defendants is ready for a decision, the court will make a final decree at the first hearing; but if it is not ready as between the defendants, the court merely decides that the bill is properly brought, and dismisses the plaintiff with his costs up to that time, and directs an action or an issue, or a reference to a master to ascertain the disputed facts, as may be best suited to the nature of the case. 2 Story Eq. Jur. § 822. *Horton* v. *Baptist Church*, 34 Vt. 317; *Farley* v. *Blood*, 30 N. H. 354. At the hearing, or on the trial of the issue, or on the reference before the master to settle the rights of the defendants to the bill of interpleader, the defendants may read the answers of each other.

While the remedy by interpleader existed at the common law, it was not allowed in any personal action except *detinue*; and then only when it was founded upon a joint bailment, privity of contract or upon a finding.

The proceedings in the case now under consideration, not being so founded, can not be sustained, as an interpleader at common law, and we have already shown that it could not be sustained as an interpleader in equity.

It must therefore rest on ch. 107 of the Code of 1868, and in all respects be governed by its provisions.

In the proceedings on the bill of interpleader, each of the defendants in respect to his own claims occupies the position of a plaintiff, in a suit against his co-defendant for the recovery of the same demand, and he is required to prove every fact necessary to establish the same, which as in such suit, he may, in whole or in part do by the admissions of his co-defendant, made in his answer or otherwise.

In every such case, the court from the answers of the defendants is fully informed of the exact questions in difference between them, and when it becomes necessary to direct an issue, to determine the disputed facts in reference thereto, the court can have no difficulty in determining upon which party the burden of proof rests, and in directing who shall be plaintiff and who defendant in the issue, as it will always bear in mind, the rule that upon him who affirms the existence of a material fact rests the burden of proving it.

By sec. 1, ch. 107 of the Code of 1868, it is provided that, "upon affidavit of a defendant in any action, that he claims no interest in the subject-matter of the suit, but that some third party has a claim thereto, and that he does not collude with such third party, but is ready to pay or dispose of the subject-matter of the action as the court may direct, the court may make an order requiring such third party to appear and state the nature of his claim, and maintain and relinquish it, and in the meantime stay the proceedings in such action. * * * * * If such third party on being so served shall appear, the court shall allow him to make himself defendant in the action, and either in said action or otherwise, cause such issue or issues to be tried, as it may prescribe, and may direct which party shall be considered the plaintiff in the issues; and shall give judgment on the verdict," &c.

It will be perceived that this statute has greatly extended the reach of the remedy of interpleader in courts of common law, by extending its benefits to many cases of honest, but unavoidably doubtful litigation.

Under this statute, in most cases the court can obtain but little knowledge of the character of the title or claim of the plaintiff to the subject matter in controversy. In actions of *assumpsit* the common counts in the most general manner, aver that the defendant was indebted to the plaintiff for the price of goods sold; for money lent; for work and labor done; for money had, &c. In *trover*, that plaintiff was possessed as of his own property, of the subject in controversy, and the same was lost and afterwards came into the possession of the defendant by finding, who converted the same to his use, &c.; and so in the actions of debt, and *detinue*, &c.

The "third party," when he is called in under this statute must "state the nature of his claim," and maintain it, by sufficient proof, or relinquish it. It is easy to perceive that such "third party" may be put to great disadvantage; he must state the exact nature of his claim; his adversary as well as the court, is fully informed of it, while he, as well as the court, must be content with the scanty knowledge of the character of the plaintiff's right, disclosed on the face of his declaration, and this is all the plaintiff is required to give, or

that the court can require.  Upon this state of the pleadings and in the absence of all knowledge of the facts which may appear on the trial, the court must make up, and cause to be tried such issue as he may deem proper to determine the facts disputed between the plaintiff and the claimant.   Whether the court in the form of the issue it has directed, or in designating who shall be considered plaintiff in the issue, has erred or not, can not in any degree depend upon the facts proved on the trial, for in regard to all of these, the court was of necessity uninformed.  Because of this fact, arising out of the necessities of the case, a very wide discretion is conferred upon the court, in authorizing it when ordering such issue, to direct which party shall be considered the plaintiff therein.   As this discretion must be exercised, in view of all the circumstances surrounding the cause at the time the issue is directed, we cannot say that it appears to us that the court erred, in designating who should be plaintiff in such issue merely because a state of facts has been disclosed on the trial which if known to the court at the time the issue was directed, would have made it proper, to have designated a different person as plaintiff therein.

As the issue asked by the administrator and that directed by the court, were substantially the same, we are unable to say that the circuit court erred in designating the administrator as the plaintiffs therein.

The second error assigned, is that the court refused to give to the jury the first instruction asked by the administrator. "If the jury believe all the evidence offered on behalf of the defendant, and all the evidence offered for the plaintiff so far as the same does not conflict with the evidence on behalf of the defendant, they should find in favor of the plaintiff, the administrator of the estate of Guenther Schuchardt, deceased."

This was in effect an instruction as to the weight of the evidence, well calculated to mislead the jury.   It assumed to decide the very question submitted to the jury, by telling them that if they believed all the evidence offered by the plaintiff in the issue not in conflict with that offered by the defendant in the issue to be true, it was sufficient to establish the right of said administrator to the money in contro-

versy, although they might also believe all the evidence offered by the defendant, and be fully convinced that the money was the property of the defendant, and not the property of the plaintiff in the issue. The question before the jury was not alone, whether the evidence offered was true; but if true, what facts were proved by it, and of this the jury was the sole judge. This instruction tells them, that although they may be satisfied that all the evidence offered by the defendant in the issue is true, yet if they also believe that all the evidence offered by the plaintiff in the issue not in conflict with that offered by the defendant in the issue is true then they must find for the plaintiff, although in the opinion of the jury such evidence of the plaintiff may be wholly insufficient to establish his right to the money in question, and that the evidence offered by the defendant may in the opinion of the jury, show to their entire satisfaction that she is the owner of the money in controversy.

The circuit court therefore did not err in refusing to give this instruction to jury.

Neither did it err in refusing to give the administrator's third instruction, which was as follows: "Although the jury may believe from the evidence that Wendel Dickeschied and his wife at the time the supposed gift was made, occupied two rooms in the house of Guenther Schuchardt, this would not constitute a residence by them separate from said Schuchardt within the meaning of sec. 1 of ch. 71 of the Code of W. Va. set forth in the plaintiff's instruction No. 2; if the jury also believe that the said Dickeschied and wife came there upon the invitation of said Schuchardt, boarded with him at his expense and used and occupied said rooms, and other portions of the house ' *in the manner detailed by them in their evidence*,' and that the said two rooms were cared for by said Schuchardt's servants and furnished with his furniture.'

This instruction was objectionable for the reasons assigned in *State* v. *Greer*, 22 W. Va. 816 where an instruction was held to be improper because it referred to the facts upon which it was predicated as " under the circumstances shown in evidence " because it left the jury to ascertain what the circumstances are, and they may understand them in such a way

that the law propounded in the instruction would not be applicable.   In the instructions asked above the application of the law propounded thereby—depended upon the conclusions of the jury—not as to the manner in which Wendel Dickeschied and his wife had occupied portions of the house of Schuchardt but to the " manner which they " in their "evidence had detailed they had occupied them," and as each of the jury might differ in opinion as to the " manner detailed by them," the instruction was calculated to mislead and it was for that reason properly rejected.

The second, fifth, sixth and fourth instructions asked by the plaintiff in the issue and refused, and the fourth as modified and given to the jury are as follows:

### INSTRUCTION No. 2.

"The first section of chapter 71 of the Code of West Virginia is as follows :  '1. No estate of inheritance or freehold or for a term of more than five years, in lands, shall be conveyed unless by deed or will; and no gift of any goods or chattels shall be valid unless by deed or will, or unless actual possession shall have come to and remained with the donee, or some person claiming under him.   If the donor and donee  reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section."   In this section the term goods and chattels include silver coin ; therefore if the jury believe from the evidence that Guenther Schuckardt gave the silver money here in controversy to Wendel Dickeschied for his daughter while said Schuchardt and Wendel Dickeschied resided together, and that said Wendel Dickeschied, or his daughter, did not have possession of the said money elsewhere than at such residence until after said Schuchardt's death, then such gift was not valid, and the jury should find for the plaintiff, the administrator of said Schuchardt."

### INSTRUCTION No. 5.

"It is essential to a valid gift *mortis causa* that the donor should make it in his last illness and in contemplation and expectation of death ;  and therefore although Guenther Schuchardt may have given the money here in controversy under fear of being assassinated, this of itself would not con-

stitute a valid gift *mortis causa*, and the money on his death would nevertheless become the property of the plaintiff, the administrator of said Schuchardt.

### INSTRUCTION No. 6.

"Under the statute law of this State a man can not at the same time that he retains possession of money make himself by any oral declarations trustee of a gift of such money to another in such manner as to give to such other person any rights to the said money.

### INSTRUCTION No. 4.

"If the jury believe from the evidence that the silver money here in controversy was delivered by Gunther Schuchardt to Wendel Dickeschied for his daughter Othilie as a voluntary gift from said Schuchardt to said daughter, then so long as said money remained in the hands of Wendel Dickeschied, said Schuchardt had the right to revoke the gift and reclaim the money from Wendel Dickeschied, and if the said Schuchardt died while the said money still remained in the possession of the said Wendel Dickeschied, and not yet delivered by him to his daughter, the authority to deliver was thereby revoked, and the said money is the property of the plaintiff, the administrator of the said Schuchardt.

"To the giving of which instruction the defendant in the issue objected, and the court refused to give said instruction in the shape aforesaid, but modified it by adding thereto the following:

"'But if the jury believe from the evidence that the said money was delivered to the said Wendel Dickeschied for his daughter Othilie, and further believe that she had authorized him to act for her in accepting said money from Dr. Schuchardt, and that the said Wendel so received it for her, then the jury are instructed to find for the defendant Othilie.'"

From the bill of exceptions it appears that Gunther Schuchardt, an old man, a physician and a druggist, for many years a citizen of Wheeling, the uncle of Othilie Dickeschied, to whom he was greatly attached, residing in Cincinnati at the time of his death, was murdered in his office on the evening of March 19, 1883. His wife having died June 16, 1882, he induced his sister and her husband Wendel Dickeschied to leave their home in Cincinnati, Ohio, and come to his

home in Wheeling, and keep his house for him, leaving their daughter, Othilie Dickeschied, engaged in teaching music in Cincinnati.

· They continued to reside with Dr. Schuchardt, in his house as part of his household, until his death, a period of seven or eight months.

Having sustained considerable loss by the failure of the "Savings Institution," several years before his death, he ever afterwards declined to trust his money in the banks, but converting his money into coin as he acquired it, he buried it in large jars in his wine-cellar, of which he kept the keys.

Up to the hour of ten o'clock on Sunday morning, March 18, 1883, there was thus concealed in cans and jars, silver coin, of the value of at least $7,496.75, all of which was then his property. The time when, and the manner in which this buried coin was removed from its hiding place, as well as all the circumstances preceding and attending his residence with Dr. Schuchardt are detailed in the evidence of Wendel Dickeschied, in the bill of exceptions. It discloses the fact that until about seven months previous to the death of Dr. Schuchardt, the witness with his wife and daughter, Othilie, resided in Cincinnati, Ohio, and that soon after the death of the doctor's wife, he went with his wife to reside with the doctor in Wheeling, leaving Othilie in Cincinnati.

He deposed in substance as follows: "I, with my wife were in the same house with Dr. S. We occupied the second story of the house next to the drug store, above the parlors. We had been living in this way seven or eight months at the time of his death.

"When I went to live with him he said he was glad I had come, and insisted that I should remain. He told me he could make more money than I could and that all he made, and what he might leave, was for me, with the exception of my daughter Othilie; that he would recognize her as his own child, that she would get the biggest share of it, and and that she could live after his death without doing any work. He said he wanted us to stay all his life. He was afraid of being assassinated. He told me that if I was with him, he was sure he would not be injured. I wanted to leave

once, he said 'very well, if you go away I never see you alive again. They will kill me in cold blood. If that one don't poison me some other one will kill me. Don't you do that for God's sake. Don't take away the last resource I got: Don't take your wife away, and don't you go.'

"I was to occupy the next house to the drug-store—the second story. 'They are yours, everything here are yours.' 'Nobody has any business here except you and your wife.' On Sunday, the day before the doctor was killed, I passed over the porch and went through the kitchen. He said he wanted to see me. He told me to take a basket, put some paper in it and go to the cellar, and there he had a basket already standing with silver money. He said all this money which I got down here belongs to your daughter Othilie, you take it down and give it to her. Then he said 'take it up stairs and pack it in that trunk in your room.' I carried it up until he says, 'I am glad to have that out of my hands now ; whatever may happen I have done my duty.' I put it in the trunk in my room which my wife and I occupied. After I had it in my possession there was nothing said about it any more, except that he ordered my wife to make, and she made some little bags. He handed me the bags and said 'Put them in your trunk too, and put the money in them. He told me to say nothing to anybody about it—it was nobody's business.' He said not to tell where I got it, or where it was. The words used by Dr. Schuchardt, when he called me into the cellar were, 'The money I got here belongs to your daughter Othilie, carry it up stairs to your room and put it in your trunk.' Next day the doctor got killed.' My daughter (Othilie) came on Tuesday evening after Dr. Schuchardt's death and returned to Cincinnati on the following Monday. In the afternoon after the doctor was buried I showed her the silver money in controversy, and told her that it was hers, that the doctor had said so. He gave it to me for her. From the time on Sunday when the silver was taken up stairs, nothing was said about the matter by Dr. Schuchardt except 'I am glad I have got that off my mind. I don't care now what happens.' 'Don't mention it to anybody, keep it secret. If the Schnelles knew it they would kill you.'" On cross-examination he further stated,

"It was between nine and ten o'clock in the morning when we went down in the cellar; he already had silver money in a basket; he walked ahead and said, 'all the money *what I got* around here belongs to your daughter Othilie. I want you to take it up stairs and put it in your trunk. It all belongs to her.' He took my basket with paper inside and said 'Hurry up, hurry up.' I went up stairs and when I came he was on the floor of the cellar where he had taken the money out near the south wall."

" After I took the first basket up stairs and came down he was grabbing silver money, and as soon as I came " Hurry up, give me that basket," I could not see what sort of a receptacle the silver was in. It was in the ground; he was setting it out of the ground. When the jars were afterwards dug up, they were about eighteen inches or two feet high and perhaps a foot across. I carried up stairs eight or ten loads of the silver.

The only connection with, or knowledge of this money that Othilie Dickeschied ever had is detailed by her in her deposition, set out in the bill of exceptions.

She deposed as follows: " I got acquainted with Dr. Schuchardt at his house in Wheeling in 1876 which is my first recollection of him. I next saw him during the illness of his wife, and the next time at her funeral," (in June 1882,) " that is the last time I ever saw him in life. I was at his funeral. He was my uncle on my mother's side. So far as I know a very good feeling indeed existed between him and me. I told my father before he went to Wheeling " Anything that uncle would want to send to me or give to me he should send it through him (my father),' to which my father said ' very well."

The first I saw of this silver money was in the afternoon after we came home from the doctor's funeral, on Thursday afternoon. I next saw it on the Sunday following. My father showed it to me. I told him to send it down to me when I would go home. I counted it and there was to my knowledge $7,640.00. We counted how much was in each bag, and I made slips of paper, and wrote the amounts on them and put them in the fourteen bags."

A few days after the death of Dr. Schuchardt, Wendel '

Dickeschied caused the trunk containing the fourteen sacks of silver coin, weighing 385 pounds to be deposited in the Exchange Bank of Wheeling, to be kept over night, saying in answer to the cashier's question "Is this some of Dr. Schuchardt's money?" "No, sir, it is my own." Some time after this, he told the cashier that this money was the property of Othilie Dickeschied.

The only other testimony bearing on the delivery of this money is found in the depositions of Louisa Dickeschied Othilie's mother, and of Rica Tofante and Vronica Auber, two domestics who had resided in the family of Dr. Schuchardt, are also set forth in the bill of exceptions.

Louisa Dickeschied deposed as follows: "At the time of Dr. Schuchardt's death I had been living with him seven months. Before his wife's death I was with him twice, and after her death I remained with him nine weeks, and then went home, and came back the same week with my husband. Dr. Schuchardt requested me to remain and live with him. He would not let me go away for seven weeks, until I promised him that I would bring my husband up with me. He wanted to have Othilie with him but she was so ill that she could not risk coming. The two rooms over the parlor were assigned to us as our rooms. Dr. Schuchardt said that these rooms should be for us, and if Othilie came she could put her piano in the back room, and if she would not bring hers along he would buy her one. There were keys to the rooms, but I paid no attention to them, the girl cleaned the rooms. Dr. Schuchardt bought a stove for me; we occupied these rooms; we slept there. The rooms we occupied were furnished with the doctor's furniture. He hired the girl that cleaned our rooms. My husband and myself ate at the same table with the doctor during our residence with him; he supplied the table, and paid the hired girl and neither my husband nor myself paid any board in money. The doctor made me presents, and every Sunday *gave my husband his spending money*, and said "Later on, you will receive more."

While I was there Dr. Schuchardt said that he had provided for Othilie, that she was not obliged to do anything else during her life time, and need not give any more music

lessons.　After the death of his wife he said "I have provided tor my Othilie."　"She need not give any more lessons."　On the Sunday before the doctor's death, I was in the kitchen; I cooked, and he admonished me not to leave the kitchen as long as there was any cooking to do, as he was afraid Robert would poison him.　On that afternoon I sewed some bags; I do not remember how many there were.　They were made of towels or towel material.　Dr. Schuchardt asked me to make these bags.　When we came back from the funeral I saw what use they were put to.　They were lying on the silver, which was in a small trunk which was in a back room where I slept.　I did'nt see that silver until after I returned from the funeral; my husband then showed it to me; it was all lying there in one trunk.　None of the bags had then been filled.　The bags were lying on the top of the silver. The trunk was locked and my husband had the key."

Rica Tofaute deposed as follows: "I lived at Dr. Schuchardt's for about five years, and left shortly before Mrs. Schuchardt died.　I knew Othilie; she was there several times; Dr Schuchardt told me she was his sister's daughter, and said he would *will* her some money and that he always thought a great deal of her, and thought more of her than of all his other relations.　When I was there he always was talking about her; he never mentioned any of the rest of his relations; I heard him talk of her *several times.*　I do not know whether he had given her any money but he said if he would die last, that money was in the cellar for her and no one else, and every one in the house knew it.　I was there two years after I found out about the money being in the cellar, and ever since I found it out I knew about the money being for Othilie.　Dr. Schuchardt used to talk at the table when he and his wife were setting together at their meals. He said that if his wife should die first *he would give* it to Othilie, and if he died first, his *wife should give* it to her. Whoever died last was to will her the money—give it to her."

Being asked "did you ever hear him say whose money that was?" she answered "Why he said it was for Miss Tillie Dickeschied."　He always said the money was for her because she was sickly and crippled and he thought he would

will her some so she could have something when she got old."

Veronica Auber, deposed as follows : "I lived as a domestic at Dr. Schuchardt's for six and a half years. I was there when his wife died, and when he was killed. I first knew Othilie Dickeschied when she came to the doctor's house. I knew there was money in the cellar. It was Othilie Dickeschied's and nobody else's, but Tillie Dickeschied's. When I first came to the doctor's house, they were telling me about the money in the cellar. I heard Mrs. Schuchardt say in the doctor's presence, ' That money in the cellar is 'Tillie Dickeschied's and nobody else's, and nobody else shall have that money but 'Tillie Dickeschied,' and that the doctor said the same. I heard that said often."

Upon cross examination she further deposed that "the doctor and Mrs. Schuchardt were talking about that money in the cellar all the time when they were in the house, telling on Sundays when they were by themselves, and Mrs. Schuchardt was *all* the *time* telling that money in the cellar if she died first *he* should *give* it to 'Tillie Dickeschied. On such occasions there was never anybody present except Mrs. Schuchardt, the doctor and me: Mrs. Schurchardt said *if she died first* the doctor should take the money out of the cellar and give it to 'Tillie Dickeschied; it was 'Tillie Dickeschied's money. *Mrs. Schuchardt* gave that money to Othilie Dickeschied because she is lame. They told me that when I went to the house, and they were talking about it when Mrs. Schuchardt was sick. She said that often. She was only sick a *couple of months.* She took sick on New Year's, and died on the 16th of June. I heard her say that about three weeks before she died. She said that to the doctor, and she said it to me too. I also heard the doctor talk about it after her death. He said the money in the cellar is 'Tillie Dickeschied's to buy a house. He did not say where it was ; I knew where it was. The doctor and Mrs. Schuchardt had said it was in the cellar. He said it was 'Tillie Dickeschied's money because she was lame, that it was nobody else's money but 'Tillie Dickeschied's ; *that she was to have it when he gave it to her.*"

Of the residue of the testimony of this witness as to the

time when the money was taken out of the cellar, who took it out, who carried it up stairs, in what vessels it was so carried up, who put it in the trunk and who put it in the bags, nothing further need be said.

With these facts betore us, three inquires are presented for our consideration.

First.—Was this alleged gift by Dr. Schuchardt, to Othilie Dickeschied a gift *causa mortis ?*

Second,—Was it a gift *inter vivos* from Dr Schuchardt to Othilie Dickeschied of the silver coin in controversy ?

Third.—Was it a declaration on the part of Dr. Schuchardt that he held said silver coin as the trustee of Othilie Dickescheid ? And it so is the same capable of being enforced against his estate ?

Grants or gifts of chattels personal are defined by Sir Wm. Blackstone to be "the act of transferring the right and possession of them; whereby one man renounces, and another man immediately acquires all title and interest therein, which may be done either in writing or by word of mouth, attested by sufficient evidence, of which, *the delivery of possession is the strongest, and most essential.* A true and proper gift or grant is always accompanied with delivery of possession, and takes effect immediately. Blackstone's Com. 2, Book 341.

There are two kinds of gifts :

First.—Gifts simply so called, or gifts *inter vivos.*

Second.—Gifts *causa mortis,* or those made in apprehension of death.

Gifts *inter vivos* have no reterence to the future and go into immediate and absolute effect. To constitute such a gift the donor must be divested of, and the donee invested with the right of property in the subject of the gift; it must be absolute, irrevocable; without any reference to its taking effect at some future period ● The donor must deliver the property and part with all present and future dominion over it. 2 Kent. 589, *Carpenter* v. *Dodge,* 20 Vt. 595 ; *Northop* v. *Hale,* 73, Me. 66, 2 Schouler Per. Prop.; *Pierce* v. *Savings Bank,* 129, Mass. 432 ; *Pope* v. *Savings Bank,* 56 Vt. 285 ; *Grover* v. *Grover,* 24 Pick. 261; *Dole* v. *Lincoln,* 31 Me. 422.

Delivery is essential both at law and in equity to the validity of a parol gift of a chattel or chose in action, and it is

the same whether it be a gift *inter vivos*, or gift *causa mortis*, for without actual delivery the title does not pass. 2 Kent. *supra.* *Ward* v. *Turner*, 2 Vesey 431; *Tate* v. *Helbert*, 2 Vesey Jr. 111; *Miller and wife* v. *Jeffress, &c.*, 4 Gratt. 472; *Cutting* v. *Gillman*, 41 N. H. 147; *Marston* v. *Marston*, 21 N. H. 491.

The definition of a gift *causa mortis* is, a gift of personal property made by a party in the expectation of death, then imminent, and upon the essential condition, that the property shall belong fully to the donee in case the donor dies as anticipated leaving the donee surviving him, and the gift is not meantime revoked, but not otherwise. 2 Schou. Per. Prop., sec. 135. Woodward, judge, in *Michener* v. *Dale*, 23 Pa. St. 59, defines it thus: "*Donatio causa mortis*, is a gift of a chattel made by a person in his last illness or in *periculo mortis*, subject to the implied conditions, that if the donor recover or the donee die first the gift shall be void." This latter definition does not seem to be entirely accurate, for it omits one condition always attached to such gifts—and that is, "if the donor in his lifetime do not revoke the gift," which all the authorities admit may be done. There must be a delivery of the property to the donee, or to some other person for his use. The donor must part with all dominion over it, so that no further act of him, or of his personal representative is necessary to vest the title perfectly in the donee; to belong to him presently, as his own property in case the owner should die of his present illness, or from the impending peril, during the lifetime of the donee, and without making any change in relation to the gift. *Borneman* v. *Sidlenger*, 15 Me. 429; *Wells* v. *Tucker*, 3 Binney 366; *Coutant* v. *Schuyler*, 1 Paige 316; *Grimes* v. *Howe*, 49 N. Y. 17; 2 Schou. Per. Prop., *supra*; *Dole* v. *Lincoln*, 31 Me. 422.

But whether the donee claims title to the chattel, as a gift *inter vivos*, or a gift *causa mortis*, the burden of proof rests upon him to establish every fact and circumstance necessary to show the validity of the gift, "of which the delivery of possession is the strongest and the most essential."

The mere possession of the chattel, unaccompanied by proof of its delivery by the donor to the donee, is insufficient to establish a gift either *inter vivos* or *causa mortis*, for every

person claiming title by gift, necessarily admits that up to the time when the gift was alleged to have been made, the chattel was the property of the donor. And as the law does not presume that the owner, has voluntarily parted with his property without any valuable consideration, the gift itself, and the delivery thereof must be proved by the party claiming under it.

In *Conklin, administrator, &c.* v. *Conklin,* 27 Sup. Court R. N. Y. 278, the administrator brought an action to recover certain bonds claimed to have been the property of his intestate at the time of his death, in possession of the defendant, who refused to deliver them to the plaintiff. The answer admitted the plaintiff's appointment as administrator, and that the intestate owned the bonds in his lifetime, but averred that before his death they became the property of the defendant by a *donatio causa mortis,* and that she then took and thereafter continuously kept possession of them, and the court held that the burden of establishing the alleged gift, rested upon the defendant, claiming under the gift. In this case Davis judge, delivering the opinion of the court said, "the admission is distinctly made by the answer that the intestate in his lifetime was the owner of the bonds, and no claim of title is set up except by virtue of the alleged *donatis causa mortis.* This state of the pleadings devolved upon the defendant the burden of establishing the alleged gift. Such gifts are not presumed. '*Nemo donare facile presumitur*' is a maxim of the law applicable to the case, and where a gift *causa mortis* is alleged, the presumption being against it, clear proof on the part of the claimant is required." 2 Kent. 444 ; *Coutant* v. *Schuyler,* 1 Paige 316 ; *Grey* v. *Grey,* 47 N. Y. 552.

In *Grey* v. *Grey, supra,* the defendant being indebted to his father upon settlement made to him his note for $425.00. In an action against him by the personal representative of his father to recover this debt, the defendant upon the trial produced the note cancelled. He testified that it had never been paid or satisfied, and it appeared that he had means of access to his father's papers. The court held that under the facts in the case possession of the note was not evidence of its discharge that the law does not presume a gift. Judgment having been given in favor of the defendant in the trial

court, the same was reversed by the supreme court, and Pickham, judge, delivering the opinion of that court said, "It is clear that if I own a chattel to-day and next week it is found in another's possession, the law does not presume a legal transfer of the title to the possessor, but as against me if title be claimed he must prove it.   It has become a maxim in the law ' *Nemo donare facile presumitur.*'   To sustain this judgment would reverse this maxim.   There is nothing left to stand upon, but a gift, and that the law does not presume."

In *Dilts, &c.* v. *Stevenson,* 17 N. J. Ch'y R. 407 it was held, that gifts of chattels to the wife are *void at law,* though they may be sustained in equity.   But even in equity where a widow seeks to establish a gift from her husband in his life time she must adduce evidence beyond suspicion, and nothing less will do than a clear irrevocable gift, either to some person as trustee, or by some clear and distinct act of his by which he divested himself of the property, and engaged to hold it as trustee for the separate use of his wife.

In *Miller and wife* v. *Jeffress, &c.,* 4 Gratt. 472, it was held, that it was not the possession of the decree which is material in a *donatio causa mortis.*   An after acquired possession of the donee is nothing, and a previous and continuing possession by the authority of the donor is no better.   In *Cutting* v. *Gilmore,* 41 N. H. 147, it was held that, delivery is essential to a perfect gift *causa mortis.*   The donor must not only *give* but he *must deliver,* and that delivery must be actual where the subject of the gift is capable of an actual delivery of the thing itself or the means of getting possession and enjoyment of the thing; and this delivery must be at the time of the gift.

It is not the *possession of the donee* but the *delivery to him by the donor,* that is material.   An after acquired possession or a present and continuing possession of the donee, though by authority of the donor, is insufficient.

*Bondreau* v. *Bondreau, administratrix, &c.,* 45 Ill. 480, was an action of *detinue* brought by the father against the administratrix of the son to recover two horses claimed by the defendant as part of the estate of the intestate, as a gift from the father.   In the trial court, the defendant had judgment. Upon writ of error the judgment was reversed, and a new

trial awarded. Breese, C. J. delivering the opinion of the court, said: "That the only ground of claim to the horses in dispute is a supposed gift of them by the father to the son; and that a son claiming property as a gift from his father, or any other person claiming as a gift ought to be held to make reasonably strict proof of the gift."

In *Young* v. *Young*, 80 N. Y. 422, it was held that to establish a valid gift a delivery of the subject of the gift to the donee, or to some person for him, so as to divest the possession and title of the donor, *must be shown.*

In *Moore* v. *Moore*, 10 Eng. R. 788, the wife who was one of the executors of her deceased husband, had in her actual possession certain railway stocks, which had been issued in exchange for a £100 railway debenture which she alleged had been given to her by her husband seven years before his death, on which she had received the dividends. The court held that she was required to prove the delivery of the £100 debenture; that the burden of proof was upon her; that the obligation rested on her as donee, to establish satisfactorily to the court, the delivery to her of the gift. Sir Charles Hall, V. C., delivering the opinion of the court in this case said: "Though the case is one between husband and wife, the *onus probandi* rests upon the plaintiff (the wife) to make out a satisfactory case to entitle her to relief in respect to these sums of stock founded on the alleged gift; and the case must be tried and determined exactly in the same way as it would have been tried and determined if a bill had been filed by the next friend of the wife, against the husband in his lifetime. I say *tried in the same way*, but then we should have had the evidence of the husband, and he would have either admitted or denied it. He being dead it must be tried in the same way, except that his evidence can not be had."

In *Milroy* v. *Lord*, 4 DeG. F. & J. 263, Medley executed a voluntary deed, proposing to assign fifty shares of stock in Louisiana bank, to Lord in trust to collect and receive the dividends and profits of the stock and apply them to the use of his neice until her marriage, if the grantor be then living, but if he should die before that time, then to transfer the stock or proceeds thereof to her, and in a certain contingency to her issue.

These shares were transferable only by entry on the books of the bank, but no such transfer was ever made. Medley died three years after the execution of the deed, during which period the dividends on the shares were received by Lord and remitted by him to the neice, sometimes directly, and sometimes through Medley himself. After his death the neice and her husband brought suit against Lord to compel the transfer of the stock and proceeds to the neice, but the court held that the stock had never been transferred, the transaction was incomplete, and could not be enforced; neither could it be enforced as a declaration of trust against Medley as a trustee holding the stock for the benefit of the neice—for the deed of settlement showed that he intended to create Lord as the trustee for that purpose, when he should be vested with the title to the stock by proper transfer on the books of the bank, which not having been done, the court of equity has no power to perfect an imcomplete gift.

Delivering the opinion of the court in this case Lord Justice Turner said, "I take the law to be well settled, that in order to render a voluntary settlement valid the settler must have done everything which according to the nature of the property comprised in the settlement was necessary to be done in order to transfer the property and render the settlement binding on him. He may do this by actually transferring the property to the persons for whom he intends to provide, and the provision will then be effectual; and it will be equally effectual if he transfers the property to a trustee for the purposes of the settlement; or declares that he himself holds it in trust for those purposes, and if the property be personal, the trust may as I apprehend be declared either in writing or by parol; but in order to render the settlement binding one or the other of the modes must as I understand it be resorted to.

"The cases I think go further, to this extent, that if the settlement is intended to be effectual in one of the modes, to which I have referred, the court will not give effect to it by applying another of these modes. If it is intended to take effect by transfer, the court will not hold the intended transfer to operate as a declaration of trust, for then every imperfect instrument would be converted into a perfect trust."

In *Pope* v. *Savings Bank*, 58 Vt. 284, B. the plaintiffs' testator deposited $800.00 in the defendant's bank in the name of C., but payable to himself. He took a deposit book which he kept and controlled; he withdrew more than half the money, and in a few months directed the treasurer of the bank to add to the first entry, "payable to S. Barlow," so as to make it read payable to S. Barlow during his life, and after his death to Marion Cushing. Before "B." made this deposit, he made his will in which was this provision. "I hereby confirm all gifts I have made or shall make to any of my children." It did not appear that "B." did or said anything else in relation to the deposit, or that indicated an intention to hold the book in trust for "C." A by-law printed in the pass-book provided that no deposit could be withdrawn without the production of the book. The bank had no communication with "C.," and understood that "B." was the depositor, and so regarded him ; "C." had no knowledge of the transaction. In this case it was held—

First.—"That there was no delivery, no acceptance, and therefore the deposit could not be sustained as a gift *inter vivos*."

Second.—"That the bank did not hold the money in trust for 'C.' "

Third.—"That the donor did not declare himself a trustee for 'C.,' and did nothing equivalent to that, hence there was no trust relation between him and 'C.' "

In the case of *Dans* v. *Ney*, 125 Mass. 590, the case was different. There, "A.," a depositor in a savings bank delivered her bank-book *accompanied by an assignment of* her deposits to "B.," upon an oral agreement that "B." should draw for her what money she wanted during her lifetime, and pay the balance if any should be left to her son. In pursuance of this agreement, "B." paid to "A." certain sums of money before her death, and the balance remaining after her death he paid her son, who was appointed the executor of her will. In this case the court held that the *delivery and assignment* to "B." constituted a valid gift, and that the son was not bound to account as executor for the money so received by him.

And so in the case of *Hill* v. *Steveson*, 63 Me. 364, where

the donor, nearly five years, before her death gave to her son-in-law, her savings-bank-book, telling him she gave the money in that bank, on that book to his wife and his wife's sister; and that she wanted him to take the book, and take care of it, and after her decease, to divide the money equally between them, the court held that this was a good delivery and constituted a complete gift of such deposits, and that such a delivery vests the equitable title in the donee, without an assignment.

Upon the evidence now in this record it cannot be maintained that the silver coin in controversy was a gift *causa mortis*. It is opposed to and wholly inconsistent with such a hypothesis. It consists of a statement from Othilie's mother professing to detail a single remark of Dr. Schuchardt on the Sunday preceding his death, when the servant girl had gone out to church, and when according to the testimony of her husband, he and the doctor were removing, or had just finished removing the silver coin from its hiding place in the cellar, to the trunk in her chamber up stairs: "On the Sunday before the doctor's death I was in the kitchen. I cooked and he admonished me not to leave the kitchen, as long as there was any cooking to do, as he was afraid "Robert would poison him." The testimony of Wendel Dickeschied on this subject is a conversation had with him, soon after witness came to live with him in August, 1882. "I wanted to go back again but he said he wanted us to stay all his life. He was afraid of being assassinated. He told me that if I was with him, he was sure he would not be injured. "The "Robert," referred to in the evidence of Mrs. Dickescheid was his nephew, then twenty seven years of age, the prescription clerk in his drug store, whom he had raised, and who had lived with him for twenty five years (the doctor having no children of his own), to whom he paid regular wages commencing at three or four dollars a week and increased from time to time until his death when he was receiving sixty dollars per month; and to whom the doctor in 1877 or 78 conveyed as a gratuity the lot and house in which the drug store was kept, reserving to himself only a life estate therein. From "Robert," he never received any injury, and he died by the hand of another of whom, so far as this record shows, he never spoke,

and no reason appears why he should have entertained any fears in regard to his personal safety from this "Robert."

It is not pretended that the doctor apprehended death from present illness or from any particular peril then imminent, or that he in fact died from such peril; and yet it is well settled law, that without apprehension of death, from some present illness or impending peril, and death actually resulting from such illness or impending peril, no gift *causa mortis* can be created. There being no evidence tending to establish such a gift, it would have been error to give to the jury the fifth instruction asked for by the plaintiff in the issue, and therefore the circuit court did not err in refusing to give it.

The second, fourth and sixth instructions asked by the plaintiff may be considered together.

Was said coin a gift *inter vivos*, or was it a declaration on the part of Dr. Schuchardt, on the 18th of March, 1883, that he held the same as trustee of Othilie Dickeschied?

If the testimony in this record is at all credible, it is certain that Dr. Schuchardt did not, by any thing that he did on that Sunday morning, intend to create a trust in himself by parol (if that could be done under sec. 1 ch. 71 of Code 1868) or to become the trustee of Othilie Dickeschied, for it is apparent, that if any such transfer ever took place as detailed by Wendel Dickeschied, it was intended to be a gift *inter vivos*, and not a declaration of trust.

We have already seen that it could not with any degree of propriety be held to be a gift *causa mortis*, nor the creation of trust. It must therefore be a gift *inter vivos* or nothing, for we have already seen, that if it was *intended* to be a gift *causa mortis*, or a gift *inter vivos* and from any cause it is invalid as such, it cannot be converted into a valid declaration of trust. *Tate* v. *Helbert*, 2 Ves. Jr. 111; *Edwards* v. *Jones*, 10 Cond. Eng. Ch. R. 79, 1 Mylne & Craig 226, 2 Rob. New. Pr. 492; *Milroy* v. *Lord, supra.*

Is it a valid gift *inter vivos?*

In Virginia for more than a hundred years there have been statutes prescribing what is necessary to make a valid gift of slaves. *Durham* v. *Dunkly*, 6 Rand. 135 ; *Hunter* v. *Jones*, 6 Rand. 541; *Patterson* v. *Franklin*, 7 Leigh 590; *Shirley* v.

*Long*, 6 Rand. 735; *Brown* v. *Handly*, 7 Leigh 119; *Barker* v. *Barker*, 2 Gratt. 344.

The revisors of the Code of 1849 reported as part of sec. 1, ch. 116, that "No gift of a slave or of any goods or chattels shall be valid unless by deed or will, or unless actual possession of such slave, goods or chattels be *bona fide* delivered to the donee."

In order to avoid as far as possible the questions that had arisen under the former statutes on this subject the joint committee of revision amended that part of the section; and it was passed in the following terms: "No gift of a slave nor of any goods or chattels shall be valid unless by deed or will or unless actual possession shall have come to, and remained with the donee, or some person claiming under him. If the donor and donee reside together at the time of the gift, possession at the place of residence shall not be a sufficient possession within the meaning of this section." Code, 1849,p. 500 ch. 117, sec. 1, ed. 1860, p. 558. This provision having been carried into sec. 1 of ch. 71, of the Code of 1868, unchanged save only that the word "slave" has been omitted, we are of opinion that the words "goods or chattels" in that section include money and every other kind of personal property, which may be the subject of a gift *inter vivos* or *causa mortis*.

As the donor in a valid gift *inter vivos*, surrenders at once and forever, all present and future dominion and control over it, he effectually excludes the claims of his wife or other distributees. It can only be over-reached by the creditors of the donor, to whose just claims, it can alone be subjected, and then only when the donor's estate proves insufficient for the payment of his debts.

The principal object which the legislature had in view, in the passage of the law as it stood in the Code of 1849—was to protect the estate of decedents from the rapacity of unscrupulous attendants residing with and constantly surrounding them, and to prevent them from appropriating to their own use the slaves or other personal property belonging to the alleged donor; and just in proportion as his personal property was valuable, and of a character to be readily appropriated,—so much the more was it necessary, that when

claimed as a gift, the actual possession of the property should be required to come to and remain in good faith, with the alleged donee.  Where the donee resides with the donor, so many opportunities of unfair dealing may be found, and so many temptations to commit perjury may exist, the legislature determined to render the same impossible by declaring that no gift of goods and chattels should be valid, unless "actual possession shall have come to and remained with the donee or some person claiming under him."  And if the donor and donee reside together at the time of the gift, possession at the place of their residence, shall not be deemed possession within the meaning of the statute."

If the purpose of the statute was to protect the owner of personal property and his distributees against the unjust claims of unscrupulous attendants or relatives residing with him; and such persons while so residing with him could be permitted to obtain possession of his personal estate, and claim title thereto, as a gift made to, and held by them as the agent of some third party not residing with the donor, the statute would become wholly ineffectual, unless the possession of such agent, should also be held to be within the prohibition of the statute.

The case under consideration affords perhaps the best illustration that can be presented, of the mischief intended to be presented by the statute.

The hoarded earnings of Dr. Schuchardt, during many years buried in his wine cellar, of which he alone carried the key, is in his undisturbed possession until ten or eleven o'clock on the morning of the day preceding his death.  Immediately after he is buried, it is found concealed in the trunk of Wendel Dickescheid, in his bed room, unknown to, and unseen by his wife and daughter, Othilie, until after they returned from the funeral of Dr. Schuchardt, on Thursday afternoon following his death.  If Othilie Dickeschied had been residing with Dr. Schuchardt, and this gift, had under these circumstances been made directly to her, it would, under said sec. 1, of ch. 71 of the Code, have been invalid for want of a sufficient delivery.

If the possession at the place of residence of the donor, by an

47

agent of the donee, residing with the donor, could render valid a gift, which if made under the same circumstances directly to the donee, would be invalid, that provision of the statute would be ineffectual to suppress the evil which it was intended to prevent.

If such person residing with the donor is to be considered the agent of the donee in the sense that actual delivery of the gift may be made to him, and such delivery to him is in fact so made, and his possession of the alleged gift is only at the place of residence of the donor, he would come within the words of the statute, and such gift to him, would be invalid for want of sufficient delivery.

On the other hand, if such party residing with the donor, having possession of such gift only at the donor's place of residence, is the agent of the donee to receive the gift for the purpose of delivering the same into the actual possession of the donee, then for the purpose of making such actual delivery to the donee, he becomes the agent of the donor, and his authority to deliver, is the authority of the donor, and he may revoke the same, at any time before the actual delivery of the gift to the donee.

If the alleged gift was invalid or incomplete because there was no sufficient delivery, no title whatever to the coin in controversy passed to Othilie Dickeschied and she could not add strength to a groundless claim by calling to her aid the equally insufficient possession of Wendel Dickeschied, who was claiming the same for her, and not under her.

But if it be conceded that the coin in controversy was given into the possession of Wendel Dickeschied, to be by him forwarded and delivered to said Othilie, yet if the donor died before the same was actually delivered to her, the gift was thereby revoked, and no valid delivery thereof could thereafter be made and the coin remained the property of the decedent.

In *Taylor* v. *Lindy*, 9 East 44, money had been voluntarily paid to the governor of the poor house at Axminster for the use of the poor of Axminster. Afterwards and before the money had been applied, the donor countermanded his order, claimed and sued in *assumpsit* for the money, and recovered the same. Lord Ellenborough delivering the opinion of the

court, said : " Take it that the money had been paid by the plaintiff to the defendant for a charitable purpose, but before the defendant had made any application of it, the plaintiff countermanded the payment, was there not then an end of the authority? and could the agent persist. in applying it against the direction of his principal ? The question is therefore reduced to the case of a countermanded agent. If the master of the work-house had applied it before any countermand it would have been too late for the countermand to have operated; but there is no pretense for saying that the payment to him for the use of the poor, was for this purpose a payment to the poor. We may assume that it would have been a legal payment and could not have been recovered again if the money had been paid over before the countermand; and still the plaintiff would be entitled to recover the money back on the ground of the countermand."

In *Sessions* v. *Moseley*, 4 Cush. 87, it was held, that if the subject of a gift be delivered to a third person with authority to deliver it to the donee, this depository, until the authority is executed by an *actual delivery* to, and acceptance by the donee, is the agent of the donor, who may revoke the authority and take back the gift; and therefore if the delivery do not take place during the donor's life time, the authority is revoked by his death, the property does not pass but remains in the donor, and goes to his executor or administrator.

The subject of the gift must be certain and there must be the mutual consent and concurrent will of both parties. The gift of a chattel must not only be delivered to, but it must not be accepted by the donee, for it is only when the gift is perfected by delivery and acceptance that it becomes irrevocable. 2 Kent 440.

When money has been paid into the hands of " B." for the benefit of a third person, the donor may countermand and revoke the gift, so long as the money remains in the hands of "B." *Cotton* v. *Missing*, 1 Madd. Ch'y R. 103 ; *Taylor* v. *Lindy*, 4 East 49.

In *Simmons* v. *Cin. Savings Bank*, 31, Ohio St., the drawer of a check delivered it to the payee intending thereby to give to the payee the fund on which the check was drawn, the

court held, that until the check was either paid or accepted the gift was incomplete; and that in the absence of such payment or acceptance the death of the drawer operated as against the payee, as a revocation of the check.

As in the case of *Moore* v. *Moore, supra,* so this case must be tried and determined exactly in the same way as it would have been tried and determined, if Othilie Dickeschied on March 19, 1883, before his death, had brought this action against Dr. Schuchardt to recover from him the silver coin in question, except, that if he had been alive, his testimony could have been used in his own behalf, or against him. The burden of proof to establish a valid gift of the coin rests upon her whatever may be the form of the issue. For the reasons hereinbefore stated we are of opinion the second and fourth instruction, asked by the plaintiff in the issue, correctly, properly propounded the law, and ought to have been so given to the jury; and that the modification of the fourth instruction given by the court was erroneous and ought not to have been given to the jury.

We are further of opinion that the sixth instruction asked by the plaintiff in the issue, was properly rejected, being a mere abstract proposition of law without any evidence to support it.

For these errors the judgment of the circuit court of Ohio county rendered herein on January 7, 1886 must be reversed with costs to the plaintiff in error, the verdict set aside, and a new trial awarded.

REVERSED. REMANDED.