## Mary B. Eichin, Administratrix of the Estate of Charles L. Eichin, Deceased, Defendant in Error, v. John F. Eichin et al., Plaintiffs in Error.

### Gen. No. 31,217.

1. EQUITY—*when subject matter within equity jurisdiction.* A bill praying for discovery, accounting and a receiver, because of the alleged fraudulent retention by the brother of plaintiff's decedent of bonds belonging to decedent for whom the brother acted as fiduciary, which allegations the evidence supported, even though asking possession of the bonds, properly was cognizable in equity.

2. JUDGMENTS AND DECREES—*when not at variance with bill.* A decree that plaintiff should have bonds prayed for, and that defendant wrongly claimed them as a gift *inter vivos* from his brother, plaintiff's deceased husband, is not at variance with the bill which did not allege anything about defendant's claim, which it was his duty, and not complainant's, to assert.

3. GIFTS—*claim of gift as dispensing with allegation of antecedent ownership.* The defendant's claim that bonds were a gift *inter vivos* to him from his brother made it unnecessary for plaintiff in her bill for recovery of the bonds to allege that they were the property of the said brother, who was her deceased husband, prior to the date of the alleged gift.

4. GIFTS—*burden of proving.* One who did not claim that bonds were given him by his brother before the latter's death until his brother's widow made claim thereto, by a bill for recovery, has the burden of proving that claim by clear and convincing evidence.

5. GIFTS—*when not shown inter vivos.* Defendant, a brother of decedent and his assistant in business, held to have failed to sustain the burden of proving a gift *inter vivos* of certain bonds, all knowledge of which he disclaimed and ownership of which he did not assert until long after decedent's death.

6. EQUITY—*when demurrer to cross-bill setting up disclaimer properly sustained.* The court did not err in sustaining demurrers to cross-bills merely containing disclaimers which could have been, and were, made otherwise.

7. COSTS—*when may be taxed against, disclaiming trustee.* Costs may be taxed against all the defendants in an action to recover bonds wrongly retained from the estate of plaintiff's decedent, although one defendant was a mere stakeholder of the bonds who disclaimed, but did take active part in helping the other defendants at the trial.

Error by defendants to the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1926. Affirmed. Opinion filed March 29, 1927.

JESS S. RABAN, for plaintiffs in error.

PARLEY H. BISHOP, for defendant in error.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

This writ of error was sued out by all three defendants to reverse a decree of the superior court of Cook county, entered November 5, 1925, wherein the court, after making numerous findings, overruled all exceptions to the master's report, confirmed the report, and decreed in substance (a) that the receiver, Greenebaum Sons Bank and Trust Company, pay and deliver to complainant certain money and bonds in its possession and that, upon doing so, it be discharged as receiver; (b) that the defendant, John F. Eichin, pay to complainant $1,267.08, together with interest thereon at 5 per cent per annum from date of decree; and (c) that the fees of the master, including stenographer's fees, be fixed at $556.80, and the receiver's fees, including those of its attorney, at $400, and that all fees be taxed as costs against all the defendants.

From this decree John F. Eichin prayed a separate appeal to this Appellate Court, but did not perfect it. From that part of the decree, adjudging the payment

of costs by them, Fred C. Eichin and Buresh prayed and perfected here their appeal (case No. 31,080), which has been consolidated for hearing with the present writ of error cause.

In the decree the court found *inter alia* that Charles L. Eichin died intestate at Chicago on December 13, 1920, leaving him surviving Mary B. Eichin, his widow, and two adopted minor children; that on December 23, 1920, complainant was appointed administratrix, etc.; that prior to January 8, 1920, Charles Eichin purchased and until his death continued to be the owner of fifteen $1,000 bonds, six being bonds of the Chicago Sanitary District, eight of the City of Milwaukee, and one of the Milwaukee County Hospital for the Insane; that on October 4, 1920, John Eichin (brother of Charles) was possessed of the bonds, and "claims to have theretofore become the owner thereof *by gift* from Charles Eichin"; that on said day John delivered them to Buresh, as trustee for the use of John and his son, Fred C., under a certain trust agreement then executed by John and Buresh; that Buresh, as such trustee, thereafter retained possession of the bonds until July 13, 1922, when by order of court he delivered them to the receiver theretofore appointed in the present cause; that Buresh, since having possession of the bonds, has collected and paid over to John the matured interest thereon up to July 13, 1922, amounting to $1,045; that neither Buresh nor Fred Eichin ever acquired or claimed to have any interest in the bonds other than as trustee and *cestui que trust* respectively; that the trust agreement expired by its terms on July 1, 1923, at which date Buresh and Fred Eichin ceased to have any right or interest in the bonds or any claim thereon; that Charles Eichin, during his lifetime, "did not make a gift" of them to John, and the latter "never was the owner of the bonds nor any part thereof"; that, upon Charles' death in December, 1920, said bonds, and all interest thereon collected by Buresh

after October 4, 1920, became a part of Charles' estate, and complainant, as administratrix, is entitled to recover said interest, and to get possession of the bonds; that after the receiver's appointment certain bonds matured and it collected their face value, as well as instalments of interest due on all bonds; that by order of court the receiver invested a portion of the moneys so received in the purchase of other bonds, and retained $400, in payment of its fees, including those of its attorney; that it now has in its possession $637.03 in money and bonds as follows: Two U. S. Third Liberty Loan bonds of the aggregate face value of $10,000; one $1,000 bond of the Milwaukee County Hospital; and five $1,000 bonds of the Milwaukee Permanent Harbor Improvement; and that said money and bonds are a part of Charles' estate, and complainant, as administratrix, is entitled to the possession of the same, and is also entitled to collect from John Eichin said sum of $1,045, which with accrued interest now amounts to $1,267.08.

On December 10, 1925, the court entered an order directing the receiver to deliver to complainant said money and bonds. In the order are recitals to the effect that John Eichin did not within the required time perfect his appeal from the decree, and that the perfected appeal of Fred Eichin and Buresh "did not have the effect of suspending the operation of the decree except so much and such parts thereof as relate to the taxing of costs against them." Subsequently the receiver filed its final report and was discharged, it appearing that it had turned over said money and bonds to complainant.

In the bill, filed June 23, 1922, complainant alleged, *inter alia,* that prior to Charles' death he had purchased the fifteen bonds in question and at his death he was the owner thereof; that John Eichin and Buresh, confederating together, "now make the false and fraudulent claim and pretense" that John lawfully ob-

tained possession of the bonds prior to Charles' death and became the owner thereof and delivered them to Buresh, who now holds them under the terms of said trust agreement, which provides that the bonds thereby were transferred to Buresh, as trustee, for the use of John and his son, Fred; that prior to Charles' death he was engaged in the shoe business in Chicago, invested his savings in bonds and other securities, employed John (his brother) as an assistant in the business and placed great confidence in him; that, "by means of such confidential and fiduciary relationship," and while acting as Charles' agent, John "obtained possession of said bonds as such agent and received them for the use of Charles"; that neither John nor Buresh paid any consideration for them; that their claims thereto "are mere shams and pretenses" and made for the purpose and with the intention of defrauding the beneficiaries of Charles' estate, and preventing complainant from obtaining possession; that since Charles' death complainant asked John repeatedly if he knew anything about them, and on each occasion he denied knowing where they were or anything about any such bonds; and that complainant fears defendants will dispose of them unless a receiver be appointed, etc. The bill prays for a discovery, an accounting, an injunction, a receiver, that the bonds be delivered to complainant, as well as the collected interest, and for such further relief as equity may require.

In their joint and several answer the defendants denied many of the material allegations of the bill. They alleged that they were "not informed" as to whether Charles purchased the bonds prior to his death; that Buresh had possession of them, as trustee, under the terms of said trust agreement (copy attached and made a part of the answer), and is the legal owner and John and Fred the equitable owners; and that Charles "disposed of them and dispossessed himself" of all right or title thereto or interest therein

long prior to his death. They denied that any fiduciary relationship existed between John and Charles prior to the latter's death, or that John obtained possession of the bonds as agent for Charles, or that he received them for Charles' use and benefit, or that John did not pay any consideration for them, or that complainant was entitled to the possession of them, or to recover said interest collected by Buresh. They further denied the right of a court of equity to take jurisdiction of the cause, and alleged that complainant had a full and adequate remedy at law and that defendants had a right to a jury trial as to the question of ownership of the bonds. The answer is noticeable for what it does *not* state. It does not allege when, how or from whom John received the bonds, or set forth any facts upon which the several claims of the defendants are based. In the trust agreement it is provided that Buresh, as trustee, shall collect all maturing interest on the bonds and pay the same to John during his lifetime, and that the agreement shall terminate on July 1, 1923, when, if John be living, Buresh shall deliver the bonds to John, and, if John be not living, to Fred.

After replication filed, the cause was referred in March, 1923, to a master in chancery. Much evidence, oral and documentary, was introduced before the master, and on March 21, 1925, he filed his report, in which, after making findings, he recommended the entry of a decree that defendants had no legal or equitable right, title or interest in and to the bonds, and that the receiver deliver the bonds, or the proceeds thereof, to complainant. Defendants' overruled objections to the report were ordered to stand as exceptions.

From complainant's evidence the following facts in substance are disclosed: She and Charles Eichin were married in November, 1898. They had no children of their own and their married life was not harmonious. About 1915 he adopted two minor children (aged re-

spectively about 12 and 10 years at the time of his death), and after said adoption he and complainant lived more harmoniously together. Up to the time he died he manifested great affection for the children and treated them as though they were his own. From the time of the marriage until his death he conducted a shoe store at No. 3042 Wentworth Avenue, Chicago. He accumulated an estate of about $35,000, consisting of the real estate where the store was located, stock on hand, $22,550 in bonds at par value (including the $15,000 bonds in question), and about $2,000 in cash on hand. The bonds in question amount to over 40 per cent of his estate. Charles' brother, John, about two years younger, had been employed by him in the store for the greater portion of 10 years. While away John had charge of the store. Charles was close in money matters and confided little in his wife as to his business and financial matters. About Thanksgiving Day, 1920, he became ill and John had full charge of the store until his death in the following month, at the age of 59 years. Shortly before his death complainant asked John if he knew anything about the bonds which her husband had raved about, and if Charles had left any bonds in the store or in John's possession, and the latter replied that he knew nothing about any bonds and that Charles "was crazy and didn't know what he was talking about." After his death complainant and her brother, Horace Marshall, changed the locks on the store, and John turned over to complainant certain moneys received from sales made during Charles' illness. After complainant was appointed administratrix, late in December, 1920, she and her brother made an inventory of the stock on hand and also made searches for papers, etc., in the store, in which John at times assisted. John suggested that they be thorough "because of Charles' peculiar habit of hiding things." At one time, during John's absence, she and her brother discovered certain check books and can-

celed checks in Charles' handwriting in a shoe box on one of the shelves, which complainant removed, and, upon John's return, asked him if the contents of the box belonged to him and he replied in the affirmative. At another time they discovered a "Yukon" bond or certificate, which John stated Charles had given to him and that it was *the only thing he ever gave me,* and he wouldn't have given me that, only he knew it was of no value." About a week after the searches, complainant, in the presence of her attorney and her brother and an inheritance tax attorney, opened Charles' safety deposit box in the vaults of a Chicago Safe Deposit Company, and there found a certain memorandum (introduced in evidence) in his handwriting, which apparently is a list of bonds, giving the name and par value of each, the date of maturity, the rate of interest, the days of interest payments, the serial numbers, and the prices paid therefor. The aggregate par value of these bonds, appearing on the memorandum, is $22,550. There also was found in the box original bonds of the aggregate par value of $7,550, and all of these are mentioned in the memorandum. There also was found three envelopes, on which is printed the name of the Northern Trust Company and certain writings are indorsed thereon, giving descriptions of bonds which conform, as far as they go, to descriptions of bonds in the memorandum. Certain bonds described were not found in the box, and these, according to the description, are the bonds in question. On the memorandum appear the names of bonds of the Chicago Sanitary District, City of Milwaukee and Milwaukee County Hospital. On several occasions, after the contents of the box had been examined, both complainant and her brother asked John if he knew anything about Charles ever owning or having possession of, or if he knew anything about, bonds of the Chicago Sanitary District, City of Milwaukee, etc., and on each occasion John said he "knew nothing"

about any such bonds.   After the inventory of the store had been completed, John was employed by complainant to keep the store open and sell the stock, was given complete charge, and from time to time turned over to complainant receipts from sales from the stock. During June, 1922, citation proceedings were instituted in the probate court of Cook county against John Eichin, and on that hearing Buresh was a witness. Shortly thereafter the present bill was filed.

On the hearing before the master, complainant also showed by the testimony of the witnesses, Fosdick, Brooks and Behrens, employees of the Northern Trust Company, supplemented by certain writings introduced in evidence, that, during the period from February, 1919, to and including January, 1920, Charles purchased the bonds in question from the bond department of the trust company, and that some of the canceled checks which had been found in the store in the shoe box (the contents of which John claimed was his property) were checks which had been given by Charles to the trust company in payment of some of the bonds.   Buresh, an attorney practicing in Chicago, was called as complainant's witness as to details concerning the execution of the trust agreement of October 4, 1920, and his receipt of the bonds in trust, and on cross-examination he testified to conversations had with John, at the time the bonds were delivered to the witness, to the effect that John said they *had been given* to John by Charles.   Although much testimony had been taken by complainant up to this time, large portions of which being directed to the claimed purchase and ownership of the bonds by Charles, this was the first time it appeared from the testimony that John claimed Charles had made *a gift* of the bonds to him.

In October and November, 1923, while defendants were introducing evidence before the master, Buresh and Fred Eichin filed separate cross-bills, in which

each alleged that the trust, created by said trust agreement, had expired by its terms on July 1, 1923, and that their respective interests in the bonds mentioned therein had terminated, and they "now" disclaimed having any further interest in the bonds or the litigation. The court sustained demurrers to these cross-bills. After these disclaimers, and after it transpired that John claimed the bonds by gift from Charles, practically the only ultimate question of fact to be determined was: Did Charles in his lifetime make a gift of the bonds to John?

On this issue several witnesses for defendants testified, to the effect that, commencing shortly after Charles' marriage and continuing nearly up to the time of his death, Charles frequently had stated that his home life was unpleasant (as one witness put it— "a hell on earth"); that his wife was extravagant and did not perform her household duties as to cooking meals, etc., and that she was quarrelsome, etc. On objection to this line of testimony Buresh, taking an active part in the hearings notwithstanding his disclaimer, argued that such testimony was competent "to show the motive of Charles in getting rid of these bonds." William Eichin, another brother of Charles, testified that several times during the year 1920, Charles had offered to give him certain bonds, but that he had refused to accept them. Fred Eichin testified that in October, 1920, Charles stated to him that he had better be good to his father (John) because the latter was going to have a lot of money some day. Other testimony of witnesses for defendants was introduced showing other claimed declarations of Charles made within a few months prior to his death, which testimony was afterwards stricken from the record as being incompetent. John Eichin on cross-examination admitted that, shortly after Charles' death, complainant, as well as her brother and her attorney, had several times asked him about bonds

Eichin v. Eichin, 244 Ill. App. 89.

belonging to Charles, and if he knew anything about any Sanitary District and City of Milwaukee bonds, and that he had replied that he did not; and further testified that he repeatedly had stated to them that he had no knowledge of *any* bonds; and that when the inquiries were made he did not know what bonds they referred to. Buresh also testified for defendant to the effect that because of the termination of the trust agreement by its terms on July 1, 1923, he had no interest whatever in the bonds mentioned therein, and that on October 7, 1920 (three days after said agreement had been executed and after he, as trustee named therein, had received them from John) he had a conversation with *Charles,* at the latter's store, at which John also was present. He was asked to state what that conversation was, and over complainant's objection, was allowed by the master to do so, as follows: "We were talking about other matters, that is, I had other business of John F. Eichin's, and when I got through with that Charles Eichin spoke to me and said, 'You have taken care of John on that other matter, haven't you?' I hesitated for a moment, and he said, 'On those bonds that I have given him.' And I said 'Yes.' * * * There was something more said, and, as I recall, Charles said that he wanted John taken care of." Buresh further testified that on October 4, 1920, when he received the bonds from John, he had a conversation with him. On objection being made the witness was not allowed by the master to state what that conversation was, whereupon defendants' solicitor made an offer to prove by the witness the following: That at the time that John Eichin brought the bonds over to the office of the witness, October 4, 1920, he stated to the witness: "Mr. Buresh, I have here these bonds that were given to me by my brother, Charles Eichin, for services that I have given him in the many years, and that at the time that he gave me the bonds, *he* said to me, 'John, here are these bonds, I promised

to make it up to you and here I am giving you these bonds. You have been faithful and worked for me for a good many years for very little money, and I hope you will enjoy them and take it easier for the rest of your life, and in about two or three years if you see business conditions better, it would please me if you took two or three thousand dollars of this money and started Fred out in business because I like the boy and I promised to help him.' '' The master ruled that only that portion of said statement of John Eichin to the witness, viz, ''I have here these bonds that were given to me by my brother, Charles Eichin,'' would be received in evidence, and that the remaining portion, being incompetent, should not be admitted. The witness further testified: ''He (John) told me how he got them and for what. He also said, 'They are mine.' '' A similar ruling was made by the master as to similar testimony offered by the witness John Eichin.

Counsel for defendants contends that the decree should be reversed and the bill dismissed for want of equity because neither the allegations of the bill nor the proof disclose a case for equitable cognizance and complainant has a complete remedy at law. In our opinion the contention is without merit. It is well settled that if a court of equity acquires jurisdiction on any equitable ground it will retain the cause and afford complete relief, although it becomes necessary to enforce purely legal rights. (*County of Cook v. Davis,* 143 Ill. 151, 155; *Fleming v. Reheis,* 275 Ill. 132, 137.) The bill prayed for a discovery, an accounting and a receiver, as well as for the possession of the bonds. Sufficient facts were alleged and proven showing the necessity for a discovery and an accounting and for a receiver. A fiducial relationship also was alleged to have existed between Charles Eichin, before his death, and his brother, John, and also fraud on the part of the defendants. And the proof sufficiently showed that such a relationship existed; that Buresh

was a mere trustee or stakeholder of the bonds for the use of John, and that John was guilty of fraud towards complainant, as administratrix, particularly in concealing the fact that over two months before Charles' death he had become possessed of the bonds and claimed them as his own, and, in response to inquiries made by complainant and others after Charles' death, stated that he knew nothing about any such bonds. We think that, under the facts as alleged and proved, the cause was a proper one for equitable cognizance. (*Moore v. Brandenburg*, 248 Ill. 232, 241; *Grimes v. Hilliary*, 38 Ill. App. 246, 247; *Winona & St. P. R. Co. v. St. Paul & S. C. R. Co.*, 26 Minn. 179, 182; *Eisentraut v. Cornelius*, 134 Wis. 532, 537.)

And in our opinion there is no merit in counsel's further contention that there is such a variance between the allegations of the bill, the evidence and the decree, as requires a reversal of the decree. Counsel argues that the allegations of fraud on the part of John Eichin and of the confidential relations existing between him and Charles were not sufficiently established. We think that they were. Counsel further argues, as we understand the argument, that, inasmuch as the decree finds that John Eichin claims to have become the owner of the bonds by gift from Charles prior to October 4, 1920, and that Charles did not make a gift of the bonds to John and that John never was the owner of them, and inasmuch as John's claim of having received them as a gift is not mentioned in the bill, the decree is at variance with both the allegations of the bill and the evidence. Even if complainant knew, at the time she filed her bill, of John's claim of ownership by gift from Charles, it was not necessary for her to mention that claim in her bill. (*Morgan v. Smith*, 11 Ill. 194, 200.) This was for him to set up in his answer, which he did not do, and it was not until complainant had introduced much evidence showing Charles' original ownership of the bonds that John's claim of ownership by gift from Charles was made.

And we think that complainant sufficiently showed by competent evidence that Charles purchased the bonds of the Northern Trust Company, and had possession of them prior to October 4, 1920. This issue, however, was eliminated from the case when John's claim (that he received them from Charles *as a gift* prior to said date) was first made during the hearing before the master, for, as said in *Dickeschied v. Exchange Bank,* 28 W. Va. 340, 360, "every person claiming title by gift necessarily admits that, up to the time when the gift was alleged to have been made, the chattel was the property of the donor." And, John having made the claim, the burden was upon him to prove it by clear and convincing evidence. In 28 C. J. p. 660, § 61, it is said: "The actual *delivery* of negotiable bonds, with words or acts indicating a present absolute gift, constitutes a valid gift *inter vivos.*" In 28 C. J. p. 670, § 71, it is said: "The burden of proof is on one claiming to be the donee of property to establish all facts essential to the validity of such gift." (See also *Merchants' Loan & Trust Co. v. Egan,* 222 Ill. 494, 497; *Gano v. McCarthy's Adm'r,* 79 Ky. 409, 411; *Duckworth v. Orr,* 126 N. C. 674, 676.) In *Dickeschied v. Exchange Bank, supra,* it is said: "The mere possession of the chattel, unaccompanied by proof of its *delivery* by the donor to the donee, is insufficient to establish a gift either *inter vivos* or *causa mortis.*" In 28 C. J. p. 682, § 87, it is said: "Where the proof of an alleged gift rests upon the declarations of the donor, those declarations must be unequivocal, especially where the surroundings favor the wrongful acquisition of the property." And on page 681, § 86, it is said: "Gifts first asserted after the death of the donor are regarded with suspicion by the courts, and the rule requiring gifts to be established by clear and convincing evidence is especially applicable in such cases, particularly where a confidential relation existed between the parties." (See *Humble v. Gay,* 168 Cal. 516, 520;

*In re Estate of Turner,* 244 Pa. 568, 572.) And, under all the facts and circumstances in evidence, as above outlined, we think that John Eichin did not sustain the burden of showing a valid gift of the bonds to him, and that the chancellor was fully warranted in finding in the decree that Charles before his death did not give the bonds to John, and that the latter never was the owner of them.

Complaint is made of certain rulings as to the admission and rejection of evidence. We have considered counsel's arguments and are of the opinion that, if there were any errors as urged, they were not such as require a reversal of the decree. Complaint also is made of the action of the court in sustaining complainant's demurrers to the cross-bills of Buresh and Fred Eichin, filed several months after July 1, 1923, wherein they disclaimed having any further interest in the bonds or in the litigation. It is argued that these cross-bills were proper as they presented a "defense" which arose after the issues, made by the bill and answer, had been formed. The "defense" was merely that, because July 1, 1923, had passed, they now disclaimed as stated. The disclaimers could have been made otherwise, and in fact were made otherwise, and the cross-bills were not necessary, and we do not think that the court erred in sustaining demurrers thereto.

Counsel makes the further contention, particularly on behalf of Buresh, that the court erred in taxing the costs against *all* the defendants. It is argued that, because Buresh was a trustee of the bonds for John under the trust agreement, it was his duty to "protect" his trust, but, even so, it was no part of his duty to actively assist, as he did, John and Fred in their attempt to establish John's claims of ownership to the bonds, or in endeavoring to prevent complainant from establishing the fact that Charles had purchased the bonds and was the lawful owner of them prior to

October 4, 1920, as Buresh did prior to the time that the claim was first made on the trial that John had received the bonds from Charles as a gift. We do not think, under all the facts and circumstances, that the court abused its discretions in taxing the costs against *all* defendants. In 39 Cyc. 462, it is said: "A trustee stands in the same position as any other litigant with respect to costs; the general rule being that if trustees bring suits against strangers, or strangers bring suits against the trustees, respecting the trust funds, costs will be awarded against the losing party as in other suits." And in 15 C. J. p. 101, § 198, it is said: "Costs on the trial should not be allowed against a defendant who is a mere stakeholder of the fund in controversy between plaintiff and the other defendant, at least, where he has acted throughout the transaction without any neglect or default of any sort; but where he wrongfully retains the funds, or actively defends the suit, he may be condemned for costs." (See *Knowles v. Knowles,* 86 Ill. 1, 11; *Waterman v. Alden,* 144 Ill. 90, 107.)

Our conclusion is that the decree of the superior court of November 5, 1925, should be affirmed, and such will be the order.

*Affirmed.*

FITCH and BARNES, JJ., concur.