705 S.E.2d 595

**Leeorr M. ROSIER, and Leeorr M. Rosier, Executrix of the Estate of Stearl Rosier, Plaintiff Below, Appellant**

v.

**Robert L. ROSIER, Defendant Below, Appellee.**

**No. 35522.**

Supreme Court of Appeals of West Virginia.

Nov. 23, 2010.

Submitted Sept. 22, 2010.

Decided Nov. 23, 2010.

Virginia Jackson Hopkins, Esq., Kingwood, WV, for Appellant.

David H. Wilmoth, Esq., Elkins, WV, for Appellee.

PER CURIAM:

This appeal arises from the judgment of the Circuit Court of Tucker County, West Virginia, in a case between the appellant, Leeorr Rosier (hereinafter referred to as Mrs. Rosier), and her son, the appellee, Robert Lee Rosier. Mrs. Rosier brought the action against her son as the widow of Stearl Rosier and as the Executrix of his estate. At issue is the ownership of bank accounts, farm machinery, cattle and the propriety of certain real estate transactions executed by the appellee pursuant to a Power of Attorney given to him by his father, Stearl Rosier. Through summary judgment on four counts, and after a bench trial on the remaining count of a five-count complaint alleging fraud, lack of statutory notice of conveyance, breach of fiduciary duties, common law fraud and a negligent transfer scheme, the circuit court denied the relief sought by Mrs. Rosier and entered judgment for the appellee, Robert Lee Rosier.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Mrs. Rosier, who was 82 years old at the time of trial, was married to Stearl Rosier on February 21, 1942. She and her husband had four children, three of whom were living at the time of the commencement of this civil action. Their oldest child, Stearl Rosier Junior, predeceased his parents. The second child is the appellee. The third child is Rodney D. Rosier and Shirley A. Carr is the youngest child of the Rosiers. Stearl Rosier died on October 6, 2005, after an extended battle with cancer. Stearl Rosier was survived by the appellant, his daughter Shirley A. Carr, his son Rodney D. Rosier and the appellee Robert Lee Rosier.

When the Rosiers first were married, Stearl Rosier was in the armed services. After his stint in the military was over, the Rosiers returned to Tucker County and purchased a farm. This farm was titled solely in Stearl Rosier's name. Over the years, the appellant and her family lived in the existing home and eventually built a more modern home on that land. In addition to the marital home of the Rosiers, situate on the land is a barn, a granary and the home of the appellee, which he built there with the permission of his parents.

In 1951, the Rosiers acquired a tract of land from the Howdershelt family. This acreage was referred to as the Howdershelt tract throughout these proceedings. The Rosiers eventually expanded the Howdershelt tract to approximately 197 acres, through separate purchases of contiguous acreage that was in their joint names, with rights of survivorship.

After his return from the service, Stearl Rosier consistently worked outside of the home while the appellant tended the marital home and occasionally held outside employment. Their farming venture started small, with the acquisition and maintenance of four dairy cattle, and eventually expanded to beef cattle, chickens and pigs as well as other agricultural pursuits. The appellant testified that she worked side-by-side with her husband, performing the labors and duties involving in running the farm. At some point Robert Lee Rosier joined his father in the farming ventures. Stearl Rosier worked in the sawmill industry until he retired in 1985. For the next 20 years, he, the appellant and the appellee worked on the farm. Up until the death of Stearl Rosier, there were farming activities on the land.

During the course of the parties' marriage, the Rosiers acquired other real estate. The appellant, as her mother's sole heir, inherited a 52–acre tract of land from her mother situate in Clover District of Tucker County. This land was titled solely in her husband's

name. This tract of land was referred to throughout these proceedings as the Dove–Duggar tract.

In late 2004, Stearl Rosier was diagnosed with cancer. At this time Mrs. Rosier's health was generally good, but she suffered from limited eyesight because of macular degeneration. The appellee and his wife assisted his parents in paying bills and other bookkeeping matters. About this same time, by deed dated December 6, 2004, Stearl Rosier conveyed the 139–acre tract containing the homeplace that was solely in his name to the appellee, Robert Lee Rosier. The deed was recorded in the Office of the Clerk of the County Commission of Tucker County on July 29, 2005, some seven months after it was originally signed. The stated consideration on the deed was that this was a gift between father and son, and as such, there was no transfer tax. The deed reserved a life estate for Stearl Rosier, but not for Mrs. Rosier. In addition, the deed contained the following paragraph regarding Stearl Rosier's care:

The Grantee, Robert L. Rosier agrees to care for his father, Stearl Rosier and keep him on the property and at home to the best of his ability as part of the consideration for this conveyance.

On the top of the recorded deed, in someone's handwriting, was the notation "Do Not Publish." The attorney who prepared this deed, William Montgomery Miller, testified in a deposition about the circumstances that led to the preparation of the deed and the inclusion of the phrase "Do Not Publish". Mr. Miller stated that it was fairly common for persons who did not wish for the newspaper to publish their real estate transactions to request no publication from the personnel of the county clerk's office. He stated that while the newspaper could publish what it wished from the public records of the county clerk's office, it often honored these requests. Mr. Miller did not know why the deed was recorded months after its execution. He testified that he believed he gave the original to either Stearl Rosier or the appellee after the deed was executed in his office.[1] As well as drafting the deed, Mr. Miller was the notary public who attested to the signature of Stearl Rosier.

After his cancer diagnosis, on December 1, 2004, Stearl Rosier executed a broadly-worded durable Power of Attorney to the appellee. Attorney Miller prepared this document for Stearl Rosier. Under the terms of this Power of Attorney, Stearl Rosier authorized his son the following general powers:

To exercise or perform any act, power, duty, right or obligation whatsoever that I now have or may hereafter acquire, relating to any person, matter, transaction or property, real or personal, tangible or intangible, now owned or hereafter acquired by me, including, without limitation, the following specifically enumerated powers. I grant to my attorney(s) full power and authority to do everything necessary in exercising any of the powers herein granted as fully as I might or could if personally present, and with full power of substitution or revocation, hereby ratifying and confirming all that my attorney shall lawfully do or cause to be done by virtue of this power of attorney and the powers herein granted.

The document specifically authorized a number of acts, including the negotiation of checks, the collection of bills and debts and the ability to consent to medical treatment. The power of attorney specifically authorized the redemption or sale of savings bonds. Paragraph 6 of the Power of Attorney contained an acknowledgment that Robert Lee Rosier may deed property to himself. The paragraph stated:

That my power of attorney shall have the power and authority to deed any interest in any real estate to the power of attorney or any of the children of the power of attorney. This will not be construed as self dealing or any breach of fiduciary duty and my said power of attorney may give any personal property that may be mine to the power of attorney or their children. This will not be construed as self dealing or any breach of fiduciary relationship.

---

1. In his deposition, the appellee admitted that his wife, Beverly, held the deed for Stearl Rosier "until it needed to be recorded." The appellee stated that his father "figured if Mom found out about it, it would be more hell for him."

Paragraph 7 of the Power of Attorney contained authorization for Robert Lee Rosier to make gifts of or change ownership of bank accounts. The paragraph stated:

> My power of attorney shall have the power and authority to execute any deeds or gifts and changes of ownership and beneficiary duties including but not limited to life insurance policies, annuities, mutual funds, bonds, stocks, bank accounts, savings and checking accounts or certificates of deposit. My said power of attorney may do all of the above for their own benefit and this shall not be construed as self dealing or breach of any fiduciary relationship or duties because this is my desire.

After the power of attorney was in effect, the appellee made two conveyances of real estate to himself and/or his sister, Shirley A. Carr. These conveyances were accomplished by deeds written by Mr. Miller, and by signatures notarized by Mr. Miller. The first of these conveyances was by deed dated July 13, 2005, and recorded in the county clerk's office on July 29, 2005. This deed conveyed Stearl Rosier's undivided one-half interest in the Howdershelt properties to the appellee, Robert Lee Rosier. Another deed, dated July 13, 2005, and recorded in the county clerk's office on July 29, 2005, conveyed Stearl Rosier's one-half undivided interest in two acres along Clover District, to Robert Lee Rosier and Shirley A. Carr.[2] The stated consideration on both of these deeds was that this was a gift between father and child.

At his deposition, Mr. Miller stated that he consulted with Stearl Rosier and Robert Lee Rosier about estate planning. Mr. Miller testified that Stearl Rosier was concerned that the appellant would disinherit their children. Specifically, Mr. Miller stated that Stearl Rosier feared the appellant would leave the real estate to her sister and disinherit the Rosier children. Mr. Miller testified that he prepared deeds for the conveyance of the property from Stearl Rosier directly to Robert Lee Rosier and Shirley A. Carr. Because of Stearl Rosier's illness and a subsequent extended placement in a convalescence home, however, the deeds were later revised by Mr. Miller to reflect that the appellee, Robert Lee Rosier, was making these conveyances pursuant to his authorization as his father's attorney in fact.

Also at issue is the disposition of certain bank accounts that were the property of Stearl Rosier and/or the appellant. At trial the court heard the testimony of a witness from Mountain Valley Bank about the bank accounts owned by the appellant and/or her husband. Stearl Rosier and the appellant purchased a $40,000 certificate of deposit on June 30, 1999. On December 29, 2003, Stearl Rosier cashed in that certificate, and placed the proceeds into a savings account in the names of Stearl Rosier, the appellee and Shirley A. Carr. On March 26, 2004, Stearl Rosier withdrew $5,000 from the newly created savings account owned by him, the appellee and Shirley A. Carr and placed it into another saving account in the name of Stearl Rosier and the appellee.

On June 22, 2005, the Stearl Rosier/appellee/Shirley Carr account was closed and the sum of $37,270.24 was withdrawn by the appellee and placed into a savings account in the names of Stearl Rosier and the appellee. The appellee signed the withdrawal slip for this transaction.

On August 3, 2005, savings bonds acquired by Stearl Rosier during the course of the marriage were cashed. The proceeds were $29,256 and were distributed to Stearl Rosier in the form of a check from the Bureau for Public Debt. The appellee negotiated this check, signing his father's name on the endorsement portion of the back of the check and then signing his name, with the designation P.O.A. A total of $26,000 was deposited in the savings account in the names of Stearl Rosier and the appellee. Another $3,256 went into a checking account in the name of Stearl Rosier. On September 7, 2005, the appellee withdrew $18,000 from the savings account and placed it into the checking account. In November of 2005, the appellee withdrew $5,330.34 from the savings account and placed it into the checking account of Stearl Rosier and the appellee. As of July 21, 2009, there was a total of $40,962.51 in the savings account.

2. Shirley A. Carr reconveyed her interest in this property to the appellant after her father's death.

At the time of Stearl Rosier's death in 2005, he and Mrs. Rosier were married and residing together. In a pre-trial deposition Mrs. Rosier testified that she and her husband had a good marriage. At no time during their marriage did they separate, and she never contemplated divorcing Mr. Rosier. Despite her poor vision and her husband's advanced age and illness, they managed to care for themselves and the farm with little assistance from their families. The appellee and his wife did assist Stearl Rosier and the appellant in maintaining bank records and paying bills.

After the death of her husband, Mrs. Rosier learned of the conveyance of the marital homeplace to the appellee. She also learned that her son had conveyed to himself and his sister under the authority of the power of attorney executed by her husband all of her husband's interests in their jointly held property. Mrs. Rosier testified at her deposition and at trial that she no longer lived on the homeplace and was not allowed there. Her income is limited to a Social Security check in the approximate amount of $1,000 per month.

Stearl Rosier executed a will on November 8, 2002. Mrs. Rosier was nominated executor of the estate. Under the terms of this will, all of his estate, both real and personal, was devised to Mrs. Rosier. If Mrs. Rosier had predeceased her husband or if they had both died in a common accident or disaster, the contingent beneficiaries were Rodney D. Rosier, Shirley A. Carr and Robert Lee Rosier.[3] Had Mrs. Rosier predeceased her husband, the will provided that Rodney D. Rosier was to receive the sum of $8,000 and two shotguns. Shirley A. Carr would have received a 1.66 acre parcel of land plus the improvements thereon from the marital homeplace, as well as a tract of land designated as the Dove–Duggar Tract, also in Clover District, containing 52 acres, more or less. Shirley A. Carr was also bequeathed any motor vehicles he owned at the time of his death and a wood splitter and a rifle. Robert Lee Rosier was contingently be-

queathed all the farm machinery, equipment and cattle owned at the time of his father's death as well as the Howdershelt tracts of land located in Clover District, a two-acre tract in Clover District and two firearms. Robert Lee Rosier's wife was bequeathed a shotgun. All the rest, residue and remainder of Stearl Rosier's intangible personal property was bequeathed unto his grandchildren. The remainder of Stearl Rosier's real estate and tangible personal property was devised to his daughter Shirley A. Carr.

Acting on her own behalf and as the personal representative of her husband's estate, the appellant filed her original complaint in April of 2006. This complaint contained four counts against Robert Lee Rosier. Count 1 alleged a breach of fiduciary duty. Count 2 alleged that the real estate transactions were part of a negligent transfer and scheme. Count 3 alleged violations of W. Va.Code § 43–1–2, which requires notice to be given to a spouse upon the transfer of real estate. Count 4 requested an accounting of the property of the estate. The complaint was amended in January of 2008 when the appellant retained new counsel. The amended complaint added a fifth count, which alleged that the property transfers constituted a fraudulent conveyance of real estate with the intent to defraud creditors, under W. Va. Code § 40–1A–1, *et seq.*

The appellee's defense to his mother's complaint was that he was acting on his father's requests when he made the real estate conveyances to himself and to his sister. He admitted that after his father's death, he gave the sum of $8,000 to his brother Rodney Rosier, and gave him several firearms. Through his attorney, he argued that his mother was in no worse financial shape than she was during the marriage, when she owned only a one-half undivided interest in much of the Rosiers' real estate holdings and none of the marital homeplace, because the property had never been titled in Mrs. Rosier's name.

By order entered October 10, 2008, summary judgment in favor of the appellee, Rob-

---

**3.** The will of Stearl Rosier also created contingent beneficiaries in the event one of his three surviving children predeceased him. The particulars of that bequest are not included because the three children were in fact Stearl Rosier's survivors.

ert Lee Rosier, was granted on Counts 1, 2, 3 and 5 of the Amended Complaint of the appellant.

Count 1 of the Amended Complaint alleged that the appellee breached the fiduciary duty owed to Stearl Rosier by conveying real estate to himself with appropriate consideration. The lower court found that while there is created a presumption that such transaction is fraudulent, the presumption was successfully rebutted by Robert Lee Rosier through the testimony of attorney Miller. Therefore, the lower court found that there was no genuine issue of material fact existing as to this count, and granted judgment in favor of the appellee and against his mother, the appellant.

Count 2 of the Amended Complaint alleged that Robert Lee Rosier negligently transferred the real estate by utilizing his power of attorney over his father so as to deprive the appellant of ownership of the property. The circuit court found that Robert Lee Rosier was acting instead under the direction and request of his father, Stearl Rosier, and the transfers were not negligent.

Count 3 of the Amended Complaint alleged that Robert L. Rosier failed to give notice as required under by W. Va.Code § 43–1–2 when he utilized his Power of Attorney to transfer real estate to himself. The circuit found that while the statute does require notice to be given to a spouse when the property is transferred, it only applies to situations where a divorce occurs within five years of said conveyance. As such, there is no relief available to the appellant.

Count 5 of the Amended Complaint alleged that the transfer of the property to the appellee was done to defraud a creditor (the appellant) and was a fraudulent conveyance within the definition of W. Va. § 40–1A–1(d). The circuit court found that Stearl Rosier was not insolvent at the time of the conveyances. Further, the property transfers were made to effectuate estate planning, as opposed to part of an attempt to defraud his wife. Thus, the circuit court concluded that the fraudulent conveyance statute was not applicable to these transactions.

With four out of the five counts in the Amended Complaint being resolved by summary judgment in the appellee's favor, Count 4 remained, which alleged that the appellee improperly disposed of cattle, money, farm equipment and other personalty that rightfully belonged to the Estate of Stearl Rosier. After a bench trial, the circuit court rendered its verdict in this matter on the sole remaining issue for trial on August 12, 2009. The circuit court made the following findings of fact and conclusions of law on the monetary issues, stating that the principal liquid asset at issue is $40,000. The order stated, *inter alia:*

1. On June 30, 1999, a $40,000 CD was purchased in the names of Stearl OR Leeor, meaning that either could withdraw all of the funds.

2. On December 29, 2003, Stearl cashed in the CD and deposited the money into a savings account # 4586. Stearl placed this account in the ownership of Stearl or Robert and Shirley. *This eliminated Leeorr's claim to these funds. All of the money now in the bank flow from these funds.* (Emphasis in original).

3. On March 26, 2004, $5,000 was withdrawn and placed in savings account # 27863.[4]

4. The current balance of that account, which was owned by Stearl or Robert, is $6,545.22. *These funds are clearly Robert's property and not that of the estate.* (Emphasis in original).

5. On June 22, 2005, $37,270.24 from the CD was deposited into checking account # 27863. The current balance is $40,962.51. *These funds are clearly Robert's property and not that of the estate.* (Emphasis in original).

At the bench trial on Count 4 of the amended complaint, the circuit heard the testimony of the Tucker County Assessor, the owner of the local stockyards and an employ-

---

**4.** The testimony of the witness from Mountain Valley Bank was that account number 27863 was in fact a checking account.

ee of the bank where the Rosiers deposited their money. The Tucker County Assessor testified that the farm equipment and animals were assessed in the name of Stearl Rosier and the appellant and then were no longer on the tax records. The owner of the local stockyards testified that there were cattle transactions in the name of the appellant and Stearl Rosier.

The appellee called as a witness a former worker on the Rosier farm, Mr. Mullenax, who testified that Stearl Rosier told him that he had given all the farm equipment and cattle to the appellee because he was afraid the appellant had lost her mind and would get rid of it. The appellee testified that his father gave him the cattle and equipment in April of 2005. He also testified that some of the equipment being claimed by his mother as estate property was purchased by him. He conceded that a square bailor, post-hole digger, manure spreader, fertilizer spreader and a hay elevator was purchased by his father.

The circuit court ruled that all of the farm equipment and animals were the property of the appellee and not of the Estate of Stearl Rosier. The circuit court specifically found that the appellee's testimony was "very knowledgeable and credible. It is clear that he did, in fact, put much time and money into the farm in recent years."

The lower court's order showed that it weighed the conflicting evidence presented at the bench trial. The order stated, *inter alia:*

On the Plaintiff's side is the assessment form and the fact that there is nothing in writing showing such a gift.

On the Defendant's side is the testimony of Mr. Mullenax and the Defendant which is consistent with Mont Miller's deposition testimony.

The determining factor for the Court is the fact that Stearl Rosier had already given his son the farm. He chose not to reserve a life estate for Leeorr. Why would he give his son the farm and not the equipment to operate and keep it in the Rosier family?

The answer is clear. Stearl Rosier gave all of the equipment to Robert and none of it is the property of the estate.

On August 25, 2009, the appellant moved for a new trial. Without a hearing and by order entered August 25, 2009, the motion for a new trial was denied. This Court accepted the appellant's appeal on April 1, 2010.

## II.

### STANDARD OF REVIEW

"In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syllabus Point 1, *Public Citizen, Inc. v. First National Bank,* 198 W.Va. 329, 480 S.E.2d 538 (1996).

"A circuit court's entry of summary judgment is reviewed *de novo*." Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

With these standards in mind, we address the appellant's contentions.

## III.

### DISCUSSION

The appellant assigns the following errors were committed in the trial of this proceeding. The appellant argues that 1) the circuit court erred in not finding the conveyance of the 139–acre farm by Stearl Rosier to Robert Lee Rosier was a fraudulent conveyance within the definition of W. Va.Code § 40–1a–1, *et seq.* (Uniform Fraudulent Transfers Act); 2) the circuit court erred in finding that the appellee Robert Lee Rosier did not breach a fiduciary duty when he conveyed Stearl Rosier's real estate to himself; 3) the circuit court failed to set aside the real estate conveyances as common law and statutory fraud; 4) the circuit court erred in finding that Stearl Rosier caused the transfer of his

bank accounts, his farm machinery and cattle prior to his death because of a desire to save his children's inheritance; and 5) the circuit court erred in finding that the farm equipment and cattle were the subject of a bona fide gift to the appellee, Robert Lee Rosier.

1. Was the conveyance of a 139–acre farm to Robert Lee Rosier by Stearl Rosier a fraudulent conveyance?

■■■ The circuit court found that the December, 2004, conveyance by deed of the 139–acre tract of land by Stearl Rosier to Robert Lee Rosier was not a fraudulent conveyance, within the definition of the Uniform Fraudulent Transfers Act (hereinafter referred to as the Act), W. Va.Code § 40–1A–1, *et seq.* (2010). This statute states:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

(I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) Intended to incur, or believed or reasonably should have believed that he (or she) would incur, debts beyond his (or her) ability to pay as they became due.

(b) In determining actual intent under subdivision (1), subsection (a), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Insolvency is defined in W. Va.Code § 40–1A–2. This section provides:

a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying his (or her) debts as they become due is presumed to be insolvent.

(c) A partnership is insolvent under subsection (a) if the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

(d) Assets under this section do not include property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under this article.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

A threshold question for this Court is whether the appellant is a "creditor" of her husband, within the definition of the Act. W. Va.Code § 40–1A–1(d) defines "creditor" as "one who has a claim." The word "claim" is defined in W. Va.Code § 40–1A–4(c) as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Without a claim, the appellant cannot be a creditor. Without the appellant being a creditor of Stearl Rosier, the Act does not apply.

The appellant argues that the nature of her claim against Stearl Rosier is founded upon their long marriage, the fact that land purchases were made with marital funds, that she lived on the land and worked on the land since 1951 and that she was married to Stearl Rosier when he gave the land away without her knowledge and with some indication of an attempt to conceal the transfer by asking that it not be published. Mrs. Rosier argues that this property was marital property, within the definition of W. Va.Code § 48–1–233 (2009). Marital property is defined as being:

(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, except that marital property does not include separate property as defined in section 1–238 (sic); and

(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from: (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property; or (B) work performed by either or both of the parties during the marriage.

Separate property is defined in W. Va. Code § 48–1–237 (2009) as:

(1) Property acquired by a person before marriage;

(2) Property acquired by a person during marriage in exchange for separate property which was acquired before the marriage;

(3) Property acquired by a person during marriage, but excluded from treatment as marital property by a valid agreement of the parties entered into before or during the marriage;

(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution;

(5) Property acquired by a party during a marriage but after the separation of the parties and before ordering an annulment, divorce or separate maintenance; or

(6) Any increase in the value of separate property as defined in subdivision (1), (2), (3), (4) or (5) of this section which is due to inflation or to a change in market value resulting from conditions outside the control of the parties.

 Under these definitions, all of the real estate and bank accounts acquired by Stearl Rosier during the course of his marriage to Mrs. Rosier would have been considered marital property. The definitions of marital property have no relevance outside of the domestic relations statutes. The applicability of the marital and separate property definitions beyond the domestic relations statutes is governed by W. Va.Code § 48–1–233, which states:

The definitions of "marital property" contained in this section has no application outside of the provisions of this article, and the common law as to the ownership of the respective property and earnings of a husband and wife, as altered by the provisions of article 29 of this chapter and other provisions of this code, are not abrogated by implication or otherwise, except as expressly provided for by the provisions of this article as such provisions are applied

in actions brought under this article or for the enforcement of rights under this article.

Further, as stated in W. Va.Code § 48–7–108: "[a] husband or wife may alienate property at any time prior to the entry of an order under the provisions of this article or prior to the recordation of a notice of lis pendens ..." This code section further declares: "Neither this article nor the doctrine of equitable distribution of marital property shall be construed to create community property nor any other interests or estate in property except those previously recognized in this state." We conclude then that the basis of any "claim" within the Act cannot be founded upon whether the affected property would have been declared marital property had the Rosiers been seeking a divorce prior to Stearl Rosier's death. As noted herein, at no time were the Rosiers separated, and at the time of Stearl Rosier's death, Stearl Rosier and his wife seemed to be happily married.

The appellant also posits that she had an actual inheritance right to the property that was conveyed away under both Stearl Rosier's probated will and the elective share statute, W. Va.Code § 42–3–1. This statute created an inheritance mechanism for spouses whose decedent died domiciled in this state. The statute allows the surviving spouse to elect against a will, if the decedent died testate, or to take the elective share in lieu of intestate distribution. The elective share distribution is a percentage of the decedent's augmented estate, where the percentage is based upon the length of the marriage. In the instant case, if Leeorr Rosier had elected against the will of her husband, she would have been entitled to 50 percent of his augmented estate. Under W. Va.Code § 42–3–4, the decision to take an elective share, as opposed to taking under a will or through intestate succession, must be made within nine months of the spouse's death, or within six months of the commencement of the probate of the estate, whichever time period is longer.

The augmented estate is defined in W. Va.Code § 42–3–2. The augmented estate consists of the value of the decedent's pro-bate estate, reduced by funeral and expenses for administration of the estate, homestead exemption, property exemption and enforceable claims plus the value of the decedent's reclaimable estate. W. Va.Code 42–3–2(b)(2) defines what is reclaimable as follows:

I) Property to the extent the passing of the principal thereof to or for the benefit of any person, other than the decedent's surviving spouse, was subject to a presently exercisable general power of appointment created by the decedent during the marriage and held by the decedent alone if the decedent held that power immediately before his or her death;

(ii) Property, to the extent of the decedent's contribution to it during the marriage, as a percentage of the whole, by which the property is held by the decedent and any other person, except the decedent's surviving spouse, with right of survivorship, acquired during the marriage of the decedent and the surviving spouse, if the decedent held that interest immediately before his or her death;

(iii) Property transferred by the decedent to any person other than a bona fide purchaser at any time during the decedent's marriage to the surviving spouse, to or for the benefit of any person, other than the decedent's surviving spouse, if the transfer is of any of the following types:

(A) Any transfer to the extent that the decedent retained at the time of his or her death the possession or enjoyment of, or right to income from the property;

(B) Any transfer to the extent that, at the time of the decedent's death, the income or principal was subject to a power, exercisable by the decedent alone or in conjunction with any other person or exercisable by a nonadverse party, for the benefit of the decedent or the decedent's estate; or

(C) Any transfer made to a donee within two years before the decedent's death to the extent that the aggregate transfers to any one donee in either of the years exceed ten thousand dollars.

Thus, under the definitions of what is reclaimable for inclusion in the augmented es-

tate of Stearl Rosier, the appellant could have opted for her elective share and reclaimed the properties transferred by Stearl Rosier personally or by the appellee pursuant to his power of attorney.[5] It would be an inappropriate stretch, however, to take the notion of this unexercised elective share as being a "claim" within the definition of the Act to warrant declaring transactions fraudulent. Even if this Court were to declare that this was a legitimate claim to create a debtor-creditor relationship between Mrs. Rosier and Stearl Rosier, within the definition of the Act, there is still the issue of whether the transfer rendered Stearl Rosier insolvent, or whether he was insolvent at the time of the transfer.

There is no testimony that Stearl Rosier was insolvent. This particular 139–acre tract was only a part of the real estate holdings he had, and did not include the jointly held Howdershelt tract or the Dove–Duggar tract. At the time of the transfer of the real estate, Stearl Rosier possessed either in his sole name or with others (including the appellee) bank accounts, savings bonds and other monetary assets. Stearl Rosier was clearly not insolvent. Accordingly, the circuit court's ruling must be affirmed on the issue of whether this conveyance was fraudulent within the definition of the Act. Therefore, because Mrs. Rosier cannot be deemed a creditor under the Act, and also because Stearl Rosier was not insolvent as a result of making the conveyance at issue, this Court determines that the conveyance of the 139–acre farm to Robert Lee Rosier by Stearl Rosier was not a fraudulent conveyance under the Uniform Fraudulent Transfers Act.

### 2. Did the appellee breach a fiduciary duty owed to his father?

The appellant argues that because Robert Lee Rosier was in a fiduciary relationship to his father, Stearl Rosier, because of the power of attorney, his conveyances of Stearl Rosier's property to himself for little or no consideration was fraudulent. In support of her argument, the appellant cites the

cases of *Napier v. Compton,* 210 W.Va. 594, 558 S.E.2d 593 (2001) and *Work v. Rogerson,* 152 W.Va. 169, 160 S.E.2d 159 (1968). In *Work,* we held:

> The general rule with regard to fraud is that it is never presumed and when alleged it must be established by clear and distinct proof. However, this general rule is qualified and the burden is shifted where a fiduciary relationship exists.

Syl. Pt. 1, *Work.* We further held that "[w]here a fiduciary relationship exists and there is an indication of fraud a presumption of fraud arises and the burden of going forward with the evidence rests upon the fiduciary to establish the honesty of the transaction." Syl. Pt. 10, *Work.*

At issue is the propriety of the appellee's conveyances of his father's one-half undivided interest in the real estate owned by Stearl Rosier and the appellant as joint tenants. The appellant pled a breach of the fiduciary duty owed by the appellee to his father, and argues that the appellee has failed to cite any admissible evidence whatsoever that could overcome the presumption that these conveyances were fraudulent.

We note from the outset that the power of attorney executed by Stearl Rosier expressly provides for Robert Lee Rosier to convey property and resources to himself. In paragraph 6 and 7 of the document, Stearl Rosier expressly states that he authorized the appellee to deed any interest in real estate to himself or to any of his children and to make gifts to himself and further, that these actions "shall not be construed as self dealing or breach of any fiduciary relationship or duties because this is my desire." While the lower court's order granting summary judgment in favor of the appellee does not specifically cite these provisions of the power of attorney executed by Stearl Rosier, the circuit court did state that the appellee's actions were the result of acting upon his father's requests.

5. While not specifically addressed by the lower court or the appellant in her petition, we would note that for the purposes of Stearl Rosier's augmented estate under the elective share statute, the appellant would have been able to re-

claim the transfers of the Howdershelt property, the marital farm and the other properties conveyed by Stearl Rosier or the appellee acting as his power of attorney.

We must glean from the lower court's order upon what evidence these findings and conclusions were based. At the time of the granting of the summary judgment motion in favor of the appellee, the deposition of the attorney, Mr. Miller, who prepared the power of attorney and deeds for Stearl Rosier and the appellee, was in the record. The appellant argues that the lower court's findings were based on inadmissible hearsay evidence rendering the decision incorrect. The appellee admits that the testimony of Mr. Miller would be hearsay, but asserts that it would fall within any number of exceptions to the hearsay rules. In addition, the applicability of the Dead Man's Statute must be determined.

We must first review the circuit court's conclusions of law to determine whether these statements were hearsay, and if so, whether the statements fall within any number of exceptions to the prohibition of hearsay. We also acknowledge that it was the appellee himself in his pre-trial memorandum who argued to the lower court that the West Virginia Dead Man's Statute may be applicable to this case. A careful review of the record does not indicate whether the circuit court took this statutory prohibition against certain testimony into account in its findings of fact and conclusions of law, or analyzed the hearsay components of some of the testimony.

The West Virginia Dead Man's Statute is contained in W. Va.Code § 57–3–1, and states as follows:

No person offered as a witness in any civil action, suit or proceeding shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person, or the assignee or committee of such insane person or lunatic. But this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor or committee shall be examined on his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence: Provided, however, that where an action is brought for causing the death of any person by any wrongful act, neglect or default under article seven, chapter fifty-five of this Code, the person sued, or the servant, agent or employee of any firm or corporation sued, shall have the right to give evidence in any case in which he or it is sued, but he may not give evidence of any conversation with the deceased.

As we noted in *Meadows v. Meadows,* 196 W.Va. 56, 468 S.E.2d 309 (1996):

"The purpose of the West Virginia Dead Man's Statute is to prevent the injustice that would result from a surviving party to a transaction testifying favorably to himself or herself and adversely to the interest of a decedent, when the decedent's representatives would be hampered in attempting to refute the testimony by reason of the decedent's death. The statute accomplishes this purpose and aids the estate not by making the testimony itself incompetent but, instead, by making the witness incompetent to testify to such matters. In note 6 of *Cross v. State Farm Mutual Automobile Insurance Co.,* 182 W.Va. [320] at 325–26, 387 S.E.2d [556] at 561 [ (1989) ], we explained that the underlying rationale of dead man's statutes "is that a survivor's lips should be sealed because the lips of the decedent are sealed." In these instances, "the decedent is unable to confront the survivor, give his or her version of the transaction or communication and expose the possible omissions, mistakes or even outright falsehoods of the survivor." 182 W.Va. at 326 n. 6, 387 S.E.2d at 561 n. 6. Thus, the premise of the statutes is "that there is a very strong temptation to lie or to conceal material facts to the detri-

ment of the decedent's representative(s)." 182 W.Va. at 326 n. 6, 387 S.E.2d at 561 n. 6, citing Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 2.2(D)(1) at 40–41 (2nd ed.1986)." *Meadows* at 196 W.Va. at 60–61, 468 S.E.2d at 313–314.

■ We have held that the Dead Man's Statute must be strictly construed and limited to its narrowest application. "The exception in sec. 23 of ch. 130 of the Code [now Code, 57–3–1] excluding witnesses from the relief from disability on the ground of interest given by that section, under certain specified conditions and circumstances, is strictly construed, and does not preclude the testimony of any witness that does not clearly come within its terms." Syllabus Point 5, *Sayre v. Whetherholt,* 88 W.Va. 542, 107 S.E. 293 (1921).

■ Further, we have held that "[a] party to a civil action may testify as a witness in regard to a personal transaction or communication between such witness and a person who is deceased at the time such testimony is given without violating the provisions of Code, 1931, 57–3–1, as amended, if the testimony thus given is against the interest of the party so testifying as a witness." Syllabus Point 2, *Holland v. Joyce,* 155 W.Va. 535, 185 S.E.2d 505 (1971). As we stated in Syllabus Point 10 of *Moore v. Goode,* 180 W.Va. 78, 375 S.E.2d 549 (1988):

"To summarize the basic operation of the Dead Man's Act, W. Va.Code, 57–3–1, a concurrence of three general conditions must be met in order to bar the witness's testimony. First, the testimony must relate to a personal transaction with a deceased or insane person. Second, the witness must be a party to the suit or interested in its event or outcome. Third, the testimony must be against the deceased's personal representative, heir at law, or beneficiaries or the assignee or committee of an insane person."

■ The testimony of the appellee regarding his numerous transactions with Stearl Rosier would appear to violate the Dead Man's Act. The testimony of the deed preparation, the account distribution, the ac-

tions taken to distribute money and personal effects to his brother, the conveyances of real estate to himself and his sister purportedly at the behest and request of Stearl Rosier are clearly "personal transactions with a deceased ... person" as defined in the Dead Man's Statute. The next requirement for the applicability of the prohibition against testimony is that the witness must be a party to the suit or interested in its event or outcome. In the case at bar, Robert Lee Rosier is a party to the suit and has a very real interest in its outcome. If Mrs. Rosier were to prevail in her suit, he would no longer have the presumed ownership of a 139–acre farm. Finally, the testimony must be against the deceased's personal representative, heir at law or beneficiaries. It would appear as though the testimony herein from the appellee was most certainly adverse to the interest of the appellant, who is the personal representative of her husband's estate. We thus conclude that the Dead Man's Statute appears to have been applicable to prohibit Robert Lee Rosier's testimony about personal transactions with his father during this proceeding.

■ Because the Dead Man's Statute would bar the appellee from testifying about his father's wishes, we must review the record to see if there was other admissible evidence demonstrating Stearl Rosier's intentions upon which the lower court could have properly relied. The deposition testimony of Mr. Miller, the attorney who prepared the power of attorney and deeds conveying Stearl Rosier's interest in the real estate to the appellee and his sister was available. While the parties agree that this testimony is hearsay, the appellee argues that this testimony falls within the exceptions of WVRE 803(3). This exclusion provides that the hearsay prohibitions do not apply to "[a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

The purpose of the testimony of the attorney was to explain Stearl Rosier's intentions when requesting the lawyer to prepare the deeds. Mr. Miller recalled that Stearl Rosier was concerned that his property would not be distributed to his children if the joint tenancy deeds were not altered. We find that this was permissible evidence, and that the circuit court could rely upon this evidence when rendering its decision.

We further find that the testimony of Mr. Miller suffices to establish that it was the intent of Stearl Rosier to break the joint tenancy. Therefore, regardless of the appellee's statements regarding his father's intentions, we find that there was sufficient information upon which the circuit court based its findings, and that those findings were not clearly wrong. As such, the judgment of the circuit court on the issue of those deeds executed by Robert Lee Rosier as power of attorney for his father, Stearl Rosier, conveying Stearl Rosier's undivided one-half interest in the property co-owned with the appellant, to himself and to his sister, is affirmed.

3. Were the conveyances of real estate common law or statutory fraud?

■ In support of her contention that the conveyance of real estate by Stearl Rosier to the appellee was fraudulent, the appellant cites W. Va.Code § 48–7–108 (2009). This section, contained in the domestic relations code, states, in pertinent part:

As to any third party, the doctrine of equitable distribution of marital property and the provisions of this article shall be construed as creating no interest or title in property until and unless an order is entered under this article judicially defining such interest or approving a separation agreement which defines such interest. Neither this article nor the doctrine of equitable distribution of marital property shall be construed to create community property nor any other interest or estate in property except those previously recognized in this state. A husband or wife may alienate property at any time prior to the entry of an order under the provisions of this article or prior to the recordation of a notice of lis pendens in accordance with the provisions of part 7–401, et seq., and at

anytime and in any manner not otherwise prohibited by an order under this chapter, in like manner and with like effect as if this article and the doctrine of equitable distribution had not been adopted: Provided, That as to any transfer prior to the entry of an order under the provisions of this article, a transfer other than to a bona fide purchaser for value shall be voidable if the court finds such transfer to have been effected to avoid the application of the provisions of this article or to otherwise be a fraudulent conveyance. Upon the entry of any order under this article or the admission to record of any notice with respect to an action under this article, restraining the alienation of property of a party, a bona fide purchaser for value shall take such title or interest as he or she might have taken prior to the effective date of this section and no purchaser for value need see to the application of the proceeds of such purchase except to the extent he or she would have been required so to do prior to the effective date of this section. . . .

The appellant argues that because there was no order entered pursuant to the divorce statutes (because there was no divorce pending or contemplated at the time of the conveyance), and since the transfer was not to a bona fide purchaser and as such, was fraudulent, the conveyance of the 139–acre farm to the appellee is voidable. The appellee counters that this section is inapplicable to the instant facts. We agree. It is uncontroverted that at the time of the conveyance of real estate to the appellee, and at the time of Stearl Rosier's death, he and the appellant were happily married. Therefore, the domestic relations statutes regarding distribution of property pursuant to a marital dissolution, should not be applicable.

■ As further authority for her claim of statutory fraud, the appellant relies upon W. Va.Code § 43–1–2. This statute requires any married person who conveys an interest in real estate to notify his or her spouse prior to or within thirty days of the time of the conveyance if the conveyance involves an interest in real estate to which dower would have attached if the conveyance

had been made prior to the date of enactment of this statute. This statute was part of the abolition of dower and revision of the laws of intestate succession by the Legislature in 1992.[6] Prior to the effective date of this statute, a surviving spouse had an interest in his or her spouse's real estate holdings to the extend that he or she would be granted a lifetime interest in one-third of the holdings upon the spouse's death. The intent of the notice provision was to make certain that transfers of real estate holdings solely in one spouse's name were known to the other spouse.

The remedy available for violations of this notice provision is contained in W. Va.Code § 43–1–2(d) as follows:

(d) When a married person fails to comply with the notification requirements of this section, then in the event of a subsequent divorce within five years of said conveyance, the value of the real estate conveyed, as determined at the time of the conveyance, shall be deemed a part of the conveyancer's marital property for purposes of determining equitable distribution or awards of support, notwithstanding that any consideration for said interest in the real estate may already be included in the marital property.

(e) Nothing in this section shall be construed to create a lien or claim against the interest in real estate conveyed in violations of this provision.

The statutory language is clear that a remedy for violations of the statute is only available for divorced or divorcing persons. Inasmuch as Stearl Rosier and the appellant were not divorced, or contemplating divorce, at the time of the conveyance of the 139–acre farm to the appellee, we believe that the appellant's reliance upon this statute is misplaced. There is simply no mechanism to bootstrap the notice provision into a cause of action for statutory fraud outside of the parties being involved in divorce proceedings. As such, we find that the lower court's grant of summary judgment on Count 3 of the appellant's Amended Complaint was correct.

4. Did Stearl Rosier cause the transfer of his bank accounts, his farm machinery and cattle prior to his death because of desire to save his children's inheritance?

This assignment of error is based upon the lower court's finding that the actions of Stearl Rosier were part of his desire to make certain that his children received their inheritance. We will first examine Stearl Rosier's disposition of the joint bank accounts.

At issue is the circuit court's ruling that the bank accounts opened by Stearl Rosier and the appellee became the property of the appellee upon the death of his father. It is uncontroverted that Stearl Rosier began disposing of the bank accounts with his wife by cashing in the certificate of deposit he held with the appellant in December of 2003, and placing the funds in an account he set up with the appellee and his daughter. The circuit court found that the majority of the funds in question flow from that transaction, as well as the cashing in of the savings bonds. Thus the question we consider is whether the establishment of the joint accounts in the name of Stearl Rosier and the appellee constituted a gift of that money, or whether the joint account was established for some other purpose, such as to allow for someone to assist Stearl Rosier with the bill-paying activities.

In *Dorsey v. Short*, 157 W.Va. 866, 205 S.E.2d 687 (1974), this Court ruled that W. Va.Code § 31A–4–33[7] creates a conclu-

---

6. A thorough explanation of the abolition of dower, the elective share and W. Va.'s laws of intestate succession is available in John W. Fisher, II's law review article, *Statutory Reform Revisited: Toward a Comprehensive Understanding of the New Law of Intestate Succession and Elective Share*, 96 WVLR 85.

7. W. Va.Code § 31A–4–33 states:
 a) If any deposit in any banking institution be made by any person describing him or herself in making such deposit as trustee for another, and no other or further notice of the existence and terms of a legal and valid trust than such description shall be given in writing to the banking institution, in the event of the death of the person so described as trustee, such deposit, or any part thereof, together with the interest thereon, may be paid to the person for whom the deposit was thus stated to have been made.

sive presumption that in the absence of fraud, mistake or other equally serious fault, a gift is intended to the survivors when a bank account is registered in the joint names of a deceased person and the survivors as joint tenants with the right of survivorship. The Court stated in Syllabus Point 2: "Code, 1931, 31A–4–33 as amended, creates, in the absence of fraud, mistake or other equally serious fault, a conclusive presumption that the donor depositor of a joint and survivorship bank account intended a *causa mortis* gift of the proceeds remaining in the account after his death to the surviving joint tenant."

Under this provision, it would appear that the bank accounts would be owned by the appellee. However, in the later case of *Kanawha Valley Bank v. Friend*, 162 W.Va. 925, 253 S.E.2d 528 (1979), we were asked to

consider whether circumstances of fraud, mistake or other equally serious fault would destroy the statutory presumption of ownership created by W. Va.Code § 31A–4–33. This case involved the ownership of a joint bank account that was funded solely by the money of a Mr. Judy who gave the account co-owner, Mr. Dunbar, a valid power of attorney authorizing him to transact business on his behalf. Utilizing the power of attorney, Mr. Dunbar established joint bank accounts with rights of survivorship in his name and in Mr. Judy's name.

■ This case led to the creation of a new syllabus point referencing the effect of a fiduciary relationship in cases of joint bank accounts. In the single syllabus point of *Kanawha Valley Bank v. Friend*, we held:

(b) When a deposit is made by any person in the name of such depositor and another or others and in form to be paid to any one of such depositors, or the survivor or survivors of them, such deposit, and any additions thereto, made by any of such persons, upon the making thereof, shall become the property of such persons as joint tenants. All such deposits, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any one of them during the lifetime of them, or to the survivor or survivors after the death of any of them.

(c) Payment to any joint depositor and the receipt or the acquittance of the one to whom such payment is made shall be a valid and sufficient release and discharge for all payments made on account of such deposit, prior to the receipt by the banking institution of notice in writing, signed by any one of such joint tenants not to pay such deposit in accordance with the terms thereof. Prior to the receipt of such notice no banking institution shall be liable for the payment of such sums.

(d) When any joint deposit account is opened on or after the first day of July, one thousand nine hundred ninety-four, the owners thereof shall be given written notice either on a signature card or in connection with the execution of a signature card, on a form to be approved by the banking commissioner, that the entire balance of any such account may be paid to a creditor or other claimant of any one of the joint tenants pursuant to legal process, including, but not limited to, garnishment, suggestion, or execution, regardless of the receipt of any notice from any of the joint tenants. Such notice shall also advise the owners of a joint deposit account that the entire balance of any such account may be paid to any of the named joint tenants at any time; pledged as security to a banking institution by any of the named joint tenants; or otherwise encumbered at the

request of any of the named joint tenants unless written notice is given to the banking institution, signed by any one of the joint tenants, not to permit such payment, pledge or encumbrance. The giving of the notice required by this section to any of the joint deposit account owners shall be deemed effective notice to all owners of the joint deposit account.

(e) If a pledge or encumbrance of any joint account created pursuant to this section is made to a banking institution and the banking institution has not received, prior to the date of the pledge, any written notice signed by any one of the joint tenants prohibiting such a pledge or encumbrance, the banking institution shall not be liable to any one of the joint tenants for its recourse against the deposit in accordance with the terms of the pledge.

(f) A banking institution may pay the entire amount of a deposit account created pursuant to this section to a creditor or other claimant of any one of the joint tenants in response to legal process employed by the creditor including, but not limited to, garnishment, suggestion, or execution, regardless of any notice received from any of the joint tenants. Upon such payment, the banking institution shall be released and discharged from all payments on account of such deposit: Provided, That payment by a banking institution to any such creditor shall be without prejudice to any right or claim of any joint tenant against the creditor or any other person to recover his interest in the deposit.

(g) The commissioner shall promulgate rules in accordance with the provisions of chapter twenty-nine-a of this code regarding the approval of forms and procedures required by this section.

A presumption of constructive fraud may arise in connection with joint bank accounts with survivorship, if the parties to the joint account occupy a fiduciary or confidential relationship. This presumption requires the person who benefits from the creation of the account to bear the burden of providing that the funds were, in fact, a *bona fide* gift.

The key component of this case was the fact that the person who held the power of attorney, and thus had the fiduciary relationship with the co-owner, used the very instrument creating the fiduciary relationship to deposit his charge's funds into an account from which he stood to benefit.

We believe that the situation was similar in the case before us. Stearl Rosier himself withdrew some funds from the certificate of deposit and placed them in an account owned by him, the appellee and Shirley A. Carr. However, the majority of the withdrawals and deposits into accounts benefitting the appellee occurred *after* the power of attorney was signed and went into effect and were made by the appellee. The surrender of a lifetime's accumulation of savings bonds, and placement of those proceeds into various accounts, was accomplished by the appellee using the power of attorney executed by Stearl Rosier. Inasmuch as these accounts were joint accounts between Stearl Rosier and the appellee, the appellee's actions were clearly self-benefitting.

The circuit court's findings do not indicate that the Court analyzed the ownership in light of the holding in *Kanawha Valley Bank v. Friend*. The burden was upon the appellee to show that these bank accounts were intended to be a *bona fide* gift, but the record is devoid of any evidence that the appellee met this burden. Thus, the circuit court's conclusions are clearly wrong and must be reversed inasmuch as the lower court ruled that Robert Lee Rosier was the proper owner of the funds in the bank accounts.

5. Was the farm equipment and cattle the subject of a *bona fide* gift by Stearl Rosier, to the appellee?

■ We next address the appellant's contention that the farm equipment and cattle were in fact assets of the Estate of Stearl Rosier as opposed to a gift made during Stearl Rosier's lifetime to his son. The circuit court found that the animals and machinery were a gift to the appellee, relying upon the conveyance of the farm on which they were used and housed.

From the evidence adduced at the bench trial of this matter, it is apparent that while the appellee asserts that the farm equipment and animals were given to him by his father, the appellant had no knowledge of this so-called gift. There was little objective indication that anyone would have known that the equipment and cattle were no longer the property of Stearl Rosier, as no transfer took place. The assessor's office continued to tax the animals on Stearl Rosier's account. The stockyard continued to deal with Stearl Rosier in terms of sales. The animals remained on the farm. The equipment remained on the farm. And while Stearl Rosier was alive, the appellant remained on the farm, continuing to do as she could to work the farm, along with her ailing husband. It was only after Stearl Rosier died that the assertion of a gift was made by the appellee.

■ We have previously detailed what must be shown to effectuate a proper gift. In a 1886 case involving ownership of bags of coins, we held that "[t]o constitute a valid gift *inter vivos*, the donor must be divested of, and the donee invested with, the right of property in the subject of the gift; it must be absolute, irrevocable and without any reference to its taking effect at some future period. The donor must deliver the property and part with all present and future dominion over it." Syllabus Point 1, *Dickeschied v. Exchange Bank*, 28 W.Va. 340, 1886 WL 1826 (1886). In Syllabus Point 4 of *Dickeschied*, we established that the burden of persuasion rested with the person claiming that there was a gift: "Where a party claims title to personal property as a gift, either inter vivos or causa mortis, the burden of proof, in whatever form the issue may be presented, rests upon him to establish the validity of the gift, of which the delivery of possession is the strongest and most material."

108

In the case *sub judice*, there is no indication that delivery of the cattle and farm equipment to Robert Lee Rosier ever took place. What occurred was the assertion of dominion by the appellee over the farm and all of its assets and contents, including the equipment and animals, after the death of Stearl Rosier. The circuit court's finding that Stearl Rosier intended to make a gift of the farm equipment and animals because he had previously conveyed the farm to the appellee does not comport with the requirements for a valid gift *inter vivos*. Nowhere in the record is there an indication that prior to his death, Stearl Rosier divested himself of his farm equipment and farm animals. To the contrary, there was evidence that he continued to work the farm and tend to his animals as best he could while battling his final illness. We hold that the circuit court was clearly wrong in determining that the farm animals and farm equipment were gifts to the appellee and reverse the circuit court on that finding.

## IV.

### CONCLUSION

For the foregoing reasons, we find no error in the circuit court's grant of summary judgment on the issues of fraudulent convey-ances, statutory and/or common law fraud as they relate to the ownership of the various real estate parcels. We find that the circuit court committed error when it found that the appellee was the owner of the bank accounts, and we therefore reverse the circuit court on that ground and find that the rightful owner of the bank accounts is the Estate of Stearl Rosier. We also find that the lower court committed error in determining that the farm animals and farm equipment were the subject of a valid gift from Stearl Rosier to the appellee, Robert Lee Rosier. We therefore reverse on this ground also find that the rightful owner of the farm equipment and animals is the Estate of Stearl Rosier. The order of the Circuit Court of Tucker County, West Virginia, entered August 12, 2009, is thus affirmed in part, reversed in part and remanded for proceedings consistent with this proceeding.

**Affirmed in part; Reversed in part; and Remanded.**